2012 WY 125

**Adam J. MERSEREAU, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. S–11–0194.

Supreme Court of Wyoming.

Sept. 26, 2012.

Representing Appellant: Tara B. Nethercott and Gay V. Woodhouse, Woodhouse Roden, LLC, Cheyenne, Wyoming. Argument by Ms. Nethercott.

Representing Appellee: Gregory A. Phillips, Wyoming Attorney General; David L. Delicath, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Jeffrey S. Pope, Assistant Attorney General. Argument by Mr. Pope.

Before KITE, C.J., and GOLDEN, HILL, VOIGT, and BURKE, JJ.

VOIGT, Justice.

[¶ 1] The appellant, Adam J. Mersereau, was convicted of one count of first-degree sexual abuse of a minor and eight counts of second-degree sexual abuse of a minor. In this appeal, he raises eight issues where he claims there was error in his trial. After a careful review of the record, we cannot say that the appellant received a fair trial. Therefore, we reverse the appellant's convictions and remand for a new trial.

## ISSUES

[¶ 2]   1.   Whether the district court's decision that the victim was competent to testify was clearly erroneous.

2.   Whether the district court abused its discretion when it admitted computer forensic evidence and family photos into evidence under W.R.E. 404(b).

3.   Whether the district court commented improperly upon the weight of the evidence.

4.   Whether the district court erred when it determined that the appellant's statement to Deputy Peech was given voluntarily.

5.   Whether plain error occurred when Deputy Peech expressed his opinion that the appellant was lying during the interview.

6.   Whether plain error occurred when the district court instructed the jury that there need be no corroboration of the victim's testimony in order to convict the appellant.

7.   Whether the State presented sufficient evidence to sustain each of the convictions.

8.   Whether the appellant received ineffective assistance of trial counsel.

## FACTS

[¶ 3]   The details of the factual allegations underlying the convictions in this case are somewhat confusing and difficult to organize into a meaningful and understandable timeline.   Suffice it to say, the appellant was charged with one count of first-degree sexual abuse of a child, wherein it was alleged that the appellant anally penetrated his four-year-old stepson in the family car.   The charges were brought after the victim had been examined by the family's physician assistant, a sexual assault nurse examiner, and a forensic interviewer.   While being interviewed by Deputy Peech with the Converse County Sheriff's Department regarding the allegation, the appellant made statements that led to eight counts of second-degree sexual abuse of a child.   These charges alleged that the appellant had engaged in various instances of sexual contact with the victim while the appellant was giving the victim a bath.   After a jury trial, the appellant was convicted of all nine of the charges against him.   Due to the

number of issues in the appeal, additional facts will be discussed when relevant.

## DISCUSSION

### *Whether the district court's decision that the victim was competent to testify was clearly erroneous*

[¶ 4]   One month before the trial began, the district court held a hearing to determine whether the victim, who was four years old at the time of the crimes and five years old at the time of trial, was competent to testify.   The district court heard testimony from the victim, a forensic psychologist, and a psychologist hired by the appellant.   Thereafter, the district court concluded that the victim was competent to testify.   The district court found specifically that the victim could· recognize the difference between the truth and a lie and that he appeared to appreciate the need to testify truthfully, he had the ability to recall specific events and had the ability to speak about them, and he had the capacity to understand simple questions.   The appellant argues that the record does not support the district court's decision and, instead, demonstrates that the victim was not competent to testify.

[¶ 5]   This Court reviews a district court's findings regarding the competency of a child to testify as follows:

> It is a well-established principle of law that competency of witnesses to testify is a question within the sound discretion of the trial court.   However, when children are called into the courtroom to testify, we have held that once the child's competency is called into question by either party, it is the duty of the court to make an independent examination of the child to determine competency, and that determination will not be disturbed unless shown to be clearly erroneous.

*English v. State*, 982 P.2d 139, 145 (Wyo. 1999) (internal citations and emphasis omitted).   We must give a considerable amount of deference to the trial court because it "is in a far better position to judge the demeanor, truth, and veracity of the witness[.]"   *Gruwell v. State*, 2011 WY 67, ¶ 25, 254 P.3d 223, 231 (Wyo.2011).   Therefore,

"[w]e do not presume to place ourselves in the shoes of the trial court in these cases by reading a cold record. The trial court sees the witness' facial expressions, hears inflections in [his] voice and watches [his] mannerisms during examination. These observations are a vital part of the ultimate ruling on competency."

*Id.* (quoting *Seward v. State*, 2003 WY 116, ¶ 32, 76 P.3d 805, 819 (Wyo.2003)).

[¶ 6] The Wyoming Rules of Evidence presume that "[e]very person is competent to be a witness except as otherwise provided in these rules." W.R.E. 601. "A person is generally competent to testify if he can understand, receive, remember and narrate impressions and is sensible to the obligations of the oath taken before testifying." *Simmers v. State*, 943 P.2d 1189, 1199 (Wyo.1997). Further, a witness' intelligence, not his age, should guide a court in determining whether the witness is competent to testify. *Baum v. State*, 745 P.2d 877, 879 (Wyo. 1987).

[¶ 7] This Court has adopted a five-part test for the district courts to consider when determining whether a child is a competent witness. The district court must determine whether the child has:

(1) an understanding of the obligation to speak the truth on the witness stand; (2) the mental capacity at the time of the occurrence concerning which he is to testify, to receive an accurate impression of it; (3) a memory sufficient to retain an independent recollection of the occurrence; (4) the capacity to express in words his memory of the occurrence; and (5) the capacity to understand simple questions about it.

*Larsen v. State*, 686 P.2d 583, 585 (Wyo. 1984).

[¶ 8] In its decision letter, the district court analyzed the five-part test and determined that the victim was competent to testify. The appellant argues, however, that the district court's conclusions are not supported by the record. After a careful review of the record, we agree with the appellant's argument, and hold that the district court's decision was clearly erroneous.

[¶ 9] The district court concluded that the victim was able to differentiate between the truth and a lie, and that he "appeared [ ] to appreciate the need for him to testify truthfully." At the competency hearing, the victim properly recognized that it would "not be the truth" to say he was outside or in California during his testimony. He also understood it was the truth to say he was currently in Wyoming. He properly stated that it was "not the truth" to say the prosecutor's shirt was purple, while it would be the truth to say it was blue. The record clearly demonstrates that, when asked simple questions, the victim understood the difference between a truth and a lie.

[¶ 10] However, the question of whether the victim appreciated the need to testify truthfully is problematic. At the competency hearing, the child was not asked by the district court, the prosecutor, or defense counsel whether he understood he was required to tell the truth in a courtroom. Nor was he ever asked if he understood, from a moral perspective, why it is important to tell the truth and not to tell lies, especially in the courtroom. The State points out that the forensic interviewer informed the victim that he needed to tell the truth during the forensic interview. Unfortunately, that does not demonstrate that the victim understood and appreciated the need to tell the truth in the courtroom.

[¶ 11] Immediately before his trial testimony, the district court told the victim that he needed to tell the truth, and the victim responded that he understood. However, we are not convinced, based upon the meager evidence at the competency hearing, that the victim truly did understand that obligation. This is borne out by the fact that at the competency hearing and at the trial, the victim testified to verifiably untrue information, including how many family members and pets he had. In fact, the victim gave incorrect information about how many grandmothers, pets, and sisters he had immediately after being reminded by the district court that he needed to tell the truth.[1] We also

---

1. At the competency hearing, the victim testified    that he has one grandmother, two sisters, no

have significant concern that the victim's imagination regarding his non-existent pets was intertwined with his testimony regarding the incident where the appellant allegedly anally penetrated him:

[PROSECUTOR]: So you remember it was in the morning. Were you in the car for a long time or not very long?

[VICTIM]: Very long.

Q. Did your mom get mad that you were gone so long?

A. No, she had a cat.

Q. She what?

A. She had a cat.

Q. She had an [sic] a cat?

A. Yeah.

Q. Did you have a pet?

A. A dog. It was a boy.

Q. A boy dog?

A. Yeah.

Q. Now, when you came home on that long trip with your dad, do you remember what you did when you got home?

A. Yeah, fed the cat.

Q. You fed the cat?

A. Yeah.

Based upon all of these circumstances, we find that the district court's decision finding the victim was competent to testify was clearly erroneous. While the victim could identify the difference between the truth and a lie when asked direct questions about whether something was a truth or a lie, there is no evidence to support the conclusion that he understood the obligation to tell the truth while testifying.

[¶ 12] We are aware that the district court and this Court determine only the competency of the victim, and not his credibility. *See Watters v. State*, 2004 WY 155, ¶ 18, 101 P.3d 908, 916 (Wyo.2004). Here, the fact that the victim was telling verifiable untruths (that he knew were not true) on the witness stand has nothing to do with his credibility in this analysis. Instead, it demonstrates that he, for whatever reason, was unable to ap-

preciate the need to tell the truth in the courtroom.

[¶ 13] Further, we cannot find that this error was harmless. The victim was the only witness to the appellant's criminal conduct, and without his testimony there was no allegation of the criminal conduct except through information provided to third parties. We find that this lack of evidence is sufficiently prejudicial to the appellant that it warrants reversal of his convictions and a remand for a new trial.

[¶ 14] The appellant has also claimed that the victim's testimony was tainted by his mother and the forensic interviewer. Because this issue was not brought to the district court's attention at the competency hearing, and because we are reversing for a new trial based upon the overreaching competency issue, we decline to address whether the victim's testimony was tainted. However, we will note that, based upon the record that is before this Court, it is not a far-fetched conclusion that the victim's testimony was tainted.

[¶ 15] The victim's mother testified that she believed that the statement, "Daddy put his peepee in my butthole," may have evolved from an incident that occurred approximately six to seven months before the alleged sexual abuse was investigated by law enforcement. She explained that, after watching a story on the news about stepparents molesting their stepchildren, she asked the victim "if daddy ever stuck [his] peepee in your butt hole." She also testified that, after the victim had been examined by the physician's assistant, she called her sister and her sister-in-law and told each of them that the victim had said that "Daddy stuck his peepee in [his] butt hole." These conversations took place in front of the victim. Further, the forensic interviewer focused on the same phrase during her interview of the victim. She told the victim that his mother told her that "dad put his peepee in your butthole," and used the phrase approximately thirty-five more times throughout the course of the interview.

dogs, three cats, four mothers, five fathers, and no grandfathers. However, his mother explained that he has two grandmothers, no sisters, no cats, and two grandfathers. At trial, the vic-

tim testified that he has no grandmothers, five dogs, two cats, two sisters, and one brother. His mother thereafter testified that the victim has no cats, dogs, or sisters.

While we are not holding that this evidence does, in fact, definitively demonstrate taint, we caution the district court that this is a significant issue that should be resolved if there is a retrial.

### *Whether the district court abused its discretion when it admitted computer forensic evidence and family photos into evidence under W.R.E. 404(b)*

[¶ 16]   Before the trial began, the district court considered whether the State could produce uncharged misconduct evidence pursuant to W.R.E. 404(b).   Specifically, the State wanted to introduce several photos of the victim and his brother engaging in various innocent activities in the nude, images from the appellant's computer which the State alleged to be child pornography, and evidence that the appellant visited several pornographic websites on the internet.   The district court heard testimony from the appellant's wife and Agent Timmons, with the Division of Criminal Investigation.   After the hearing, the district court issued a decision letter, in which it determined the photos of the victim and his brother, and the fact that the appellant visited pornographic websites and that there was child pornography found on his computer were admissible, while the actual images of child pornography were too prejudicial to be admitted.

[¶ 17]   We   review   a   district court's decision regarding the admission of uncharged misconduct evidence pursuant to W.R.E. 404(b) as follows:

> We review claims of error concerning the improper admission of W.R.E. 404(b) evidence for abuse of discretion and will not reverse the trial court's decision absent a clear abuse.   *Thomas v. State*, 2006 WY 34, ¶ 10, 131 P.3d 348, 352 (Wyo.2006).   A trial court abuses its discretion when it could not have reasonably concluded as it did.   *Id.*   In this context, "reasonably" means sound judgment exercised with regard to what is right under the circumstances and without being arbitrary or capricious. *Id.*

*Rolle v. State*, 2010 WY 100, ¶ 9, 236 P.3d 259, 264 (Wyo.2010) (quoting *Bromley v. State*, 2007 WY 20, ¶ 8, 150 P.3d 1202, 1206–

07 (Wyo.2007)).   Even if a district court abused its discretion in admitting uncharged misconduct evidence, we must also determine whether the error was prejudicial.   *Rolle*, ¶ 9, 236 P.3d at 264.   " 'Error is prejudicial if there is a reasonable possibility that the verdict might have been more favorable to the defendant if the error had not been made.' " *Id.* (quoting *Vigil v. State*, 2010 WY 15, ¶ 11, 224 P.3d 31, 36 (Wyo.2010)).

[¶ 18]   W.R.E. 404 prohibits the use of evidence of a defendant's character or trait to prove that he acted in conformity with that character or trait.   W.R.E. 404(a) and (b).   However, evidence of uncharged misconduct may be admissible to prove a defendant's "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."   W.R.E. 404(b).   Use of this type of evidence carries the risk of significant prejudice to the defendant and, therefore, we have developed a mandatory procedure before evidence may be admitted under W.R.E. 404(b):

> [B]ecause uncharged misconduct evidence carries an inherent danger for prejudice, we have also adopted a mandatory procedure for testing its admissibility:  (1) the evidence must be offered for a proper purpose;  (2) the evidence must be relevant; (3) the probative value of the evidence must not be substantially outweighed by its potential for unfair prejudice;  and (4) upon request, the trial court must instruct the jury that the similar acts evidence is to be considered only for the proper purpose for which it was admitted.   We do not apply this test on appeal;  rather, it is intended to be conducted by the trial court.
>
> . . . .
>
> For proper appellate review of the admissibility   of   evidence   under   W.R.E. 404(b), the record must reflect that the trial court required the State not only to identify the proper purpose for which uncharged misconduct evidence is being offered, but also to explain how or why it is probative, and why it is more probative than prejudicial. . . .   To make sure there is no doubt in the future that this is a required process, we will repeat it now, in the body of this opinion:

In determining the probative value of prior bad acts evidence, the trial court should consider the following factors:

1. How clear is it that the defendant committed the prior bad act?

2. Does the defendant dispute the issue on which the state is offering the prior bad acts evidence?

3. Is other evidence available?

4. Is the evidence unnecessarily cumulative?

5. How much time has elapsed between the charged crime and the prior bad act?

Evidence is unfairly prejudicial if it tempts the jury to decide the case on an improper basis. In balancing against its probative value the unfair prejudice created by the evidence, the trial court should consider the extent to which the evidence distracts the jury from the central question whether the defendant committed the charged crime. The trial court should weigh these additional factors against the probative value of the evidence:

1. The reprehensible nature of the prior bad act. The more reprehensible the act, the more likely the jury will be tempted to punish the defendant for the prior act.

2. The sympathetic character of the alleged victim of the prior bad act. Again, the jury will be tempted to punish the defendant for the prior act if the victim was especially vulnerable.

3. The similarity between the charged crime and the prior bad act. The more similar the acts, the greater is the likelihood that the jury will draw the improper inference that if the defendant did it once, he probably did it again.

4. The comparative enormity of the charged crime and the prior bad act. When the prior act is a more serious offense than the charged crime, the introduction of that act will tend to place the defendant in a different and unfavorable light.

5. The comparable relevance of the prior bad act to the proper and forbidden inferences. Evidence of the prior bad act may be much more probative of bad character than it is of any legitimate inference permitted by Rule 404(b).

6. Whether the prior act resulted in a conviction. The jury may be tempted to punish the defendant if they believe he escaped punishment for the prior bad act.

*Gleason v. State*, 2002 WY 161, ¶¶ 18, 27, 57 P.3d 332, 340, 342–43 (Wyo.2002).

[¶ 19] Here, the district court held a pretrial hearing on the matter and heard testimony regarding information found on the appellant's computer, including photos of the victim and his younger brother in the nude, suspected child pornographic images of girls, and visits to pornographic websites.[2] The State argued the photos of the victim and his brother in the nude, and apparently the images of suspected child pornography, would be properly introduced to show the appellant's course of conduct and motive—namely his desire for "sexual intercourse with children" and that he "has a fetish with anal sex." While the proper purpose for the admission of the websites was not clear from the State's argument, the district court interpreted that motive was the alleged proper purpose. Further, the State provided minimal explanation as to the balancing of the probative value of all of the evidence versus the potential for prejudice against the appellant. The State simply stated that the information was "a big part of that puzzle" and was not unduly prejudicial. The State further stated: "If the defense wants a limiting instruction not to consider child pornography for the wrong reason, I understand that, but they are relevant and probative, Your Honor."

[¶ 20] Despite the State's thin attempt to demonstrate why the evidence was admissible under W.R.E. 404(b), the district court engaged in a somewhat more thorough analysis in its decision letter. The district court

---

**2.** While the State is required to give a defendant notice of its intent to use evidence pursuant to W.R.E. 404(b), such a notice is not contained in the district court record. However, it does not appear that the appellant objected to the evidence on the basis of a lack of notice, nor does he make that argument on appeal. Therefore, we will presume that the State gave proper notice of its intent to use this evidence.

analyzed each piece of evidence individually, and gave some consideration to each of the *Gleason* factors. After completing its analysis, the district court found that the photos of the victim and his brother and the fact that the appellant visited pornographic websites that might contain child pornography were admissible. The district court concluded that the actual images that may be child pornography were too prejudicial for the jury to see, but the district court did allow testimony that child pornography was found on the computer. A review of the record demonstrates that the uncharged misconduct evidence was substantially more prejudicial than probative in this case and, therefore, the district court abused its discretion in finding otherwise.

[¶ 21] With respect to the nude photos of the victim and his brother, the district court found that the State offered the photos to prove motive, which is a proper purpose. The district court then found that the appellant's possession of nude photographs of his children was relevant to show motive, considering that he was charged with sexually abusing his son. When evaluating the probative value of the evidence, the district court found that it was clear that the appellant either took or possessed the photos of his children. The district court also found that, while the appellant argued that the photos were normal photos that parents take of their children, it was for the jury to determine whether they were innocent or more sinister. The district court determined that there was no other evidence available, because these were the only nude photos of the children. The district court also found that the photos were taken in a relatively close period of time to the offenses the appellant was accused of committing. With respect to the prejudicial nature of the photos, the district court concluded that the photos were not necessarily reprehensible, but could be prejudicial if the jury did not believe them to be innocent family photos, and that the children in the photos are sympathetic victims. It determined that the photos were not very similar to the charged acts because they don't show sexual abuse, and that the enormity of the charged crime is much more significant than any bad conduct demonstrat-

ed in the photos. The district court recognized that the appellant had not been convicted of a crime associated with the photos and, while it recognized that there was a prejudicial danger associated with admitting the photos, that danger did not substantially outweigh the probative value of showing motive. Finally, the district court stated that, if requested by the appellant, it would provide a jury instruction about the limited nature of the evidence.

[¶ 22] The district court then went on to find that the pornographic images from the computer were too prejudicial to be admissible. Importantly, the district court recognized that these images could not be "established definitely" as child pornography, although the images appeared to show minors engaged in sexual acts. The district court also recognized that there was other evidence available to establish motive.

[¶ 23] Finally, the district court analyzed whether testimony regarding the pornographic websites was admissible. Again, the district court found that the State sought to offer the evidence to show motive, which is a proper purpose, and the fact that the appellant was visiting websites that depicted child pornography was highly relevant to the charged offenses. With respect to balancing the probative value versus the danger of unfair prejudice, the district court found that it was clear that the appellant viewed the aforementioned pornographic images, the appellant admitted that he visited pornographic websites, and the appellant did not dispute the issue on which the State was offering the evidence. The district court determined that the websites were the only evidence available to show that the appellant possessed child pornography, as the district court determined that the images themselves could not be admitted. The district court also found that the evidence was not cumulative and there was nothing presented to show that the images were not recently downloaded. Specifically in regard to prejudice, the district court recognized that viewing child pornography is reprehensible and there was some danger that the jury would be tempted to punish the appellant for that behavior. While victims of child pornography are sym-

pathetic, the district court believed that would be mitigated by the fact that the persons in the images were not parties in the case or was their identity known. The district court recognized that possessing child pornography is quite different from sexually abusing a child and, although it is a serious crime, is not as serious as facing multiple counts of sexual abuse of a minor. Finally, the district court found that the appellant had not been previously convicted of a crime for this behavior, and that any potential prejudice could be remedied through a jury instruction. Therefore, the evidence was admissible.

[¶ 24] Although the district court "applied" the *Gleason* test, some of the factors were not appropriately analyzed, and we cannot find that the district court could have reasonably concluded that the probative value of any of this evidence was not substantially outweighed by the potential unfair prejudice to the appellant. This Court's biggest concern is with the district court's conclusion that the fact that the appellant visited pornographic websites was admissible. First and foremost, the facts presented at the hearing did not establish that the pornographic websites the appellant visited actually contained child pornography. At the hearing, the Division of Criminal Investigation (DCI) agent testified as follows:

[PROSECUTOR]. Did you visit any [sic] of those two web sites?

[WITNESS]. Unfortunately, I could not, due to the state policy, we are on the state network, and my director would be involved in that, and I didn't want that.

When defense counsel conducted a voir dire of the agent, it was reiterated that this agent actually had no independent knowledge of what images were found on these websites:

[DEFENSE COUNSEL]. And you never visited this site?

[WITNESS]. No, I have not.

Q. And is this talking about child girls or child boys?

A. I have not visited the site, but this is what my co-workers mentioned that they described from the site from them seeing.

Q. So you have no knowledge of the site at all?

A. No.

Q. And then let's go back to the one above that. It says www.slutload.com. watch, and it has a bunch of indecipherable letters and numbers. And then it says incest/sex/video/family/taboo. Have you ever visited ed [sic] that?

A. No, I have not.

Q. You don't know what that does, correct?

A. No, as I mentioned before, I don't visit these sites from my state computer.

[¶ 25] These passages demonstrate that the DCI agent actually had no knowledge of whether the sites visited by the appellant contained any child pornography at all, and the agent had never visited the sites himself to see the content. Instead, his testimony was based upon what he had "heard" from his co-workers. In reality, this testimony was nothing more than speculation and was used to paint the appellant in a bad light in front of the jury. The State was able to insinuate that the appellant regularly looked at child pornography when going to these websites, when there was no evidence showing that these websites actually contained child pornography. Perhaps if it was certain that the websites did indeed contain child pornography, the admission of the evidence would be relevant and more probative than prejudicial. However, the fact that the appellant goes to pornographic websites does not tend to prove that he had a motive for sexually abusing the victim—a four-year-old boy. *See Simpson v. State*, 271 Ga. 772, 523 S.E.2d 320, 321, 322 (1999) ("interest in sexual activity does not necessarily point to deviant behavior, even circumstantially[ ]" (internal citation omitted); "Under this rule, sexually explicit material cannot be introduced merely to show a defendant's interest in sexual activity. It can only be admitted if it can be linked to the crime charged."). Furthermore, the only conclusion that can be drawn from the testimony is that the appellant *might* be looking at child pornography on the internet. This inference is substantially more unfairly prejudicial to the appel-

lant than it is probative of anything in dispute.

[¶ 26] Further, this Court is troubled by the fact that so much of the district court's analysis regarding the admissibility of the websites was based upon images the district court had already determined were inadmissible because they were too prejudicial. The district court found that, because the images had been deemed inadmissible, there was no other evidence available to show that the appellant downloaded and possessed child pornography. The question is not whether other evidence of the specific uncharged misconduct is available. The question is whether there is other evidence of the proper purpose available—in this case motive. Even if the district court had determined there was no other evidence of motive, we cannot find that visits to pornographic websites makes it more likely that the appellant has a "fetish with anal sex," as alleged by the State at trial, or that he is sexually attracted to children, as alleged on appeal.

[¶ 27] This Court is additionally concerned that the district court relied upon the images of suspected child pornography in determining the admissibility of the websites. While we commend the district court for recognizing the prejudicial nature of the images, the DCI agent still testified at trial that images of suspected child pornography were found on the computer. It was apparently presumed that these images came from one of the websites discussed by the agent. However, our review of the record does not show a link between the two, and there was no testimony at the hearing regarding the actual source of the images. The agent also testified that the images had not been affirmatively identified as child pornography, that he was not a certified forensic physician, and that he had no expertise in identifying child pornography. Nonetheless, the State was able to make the assertion that the appellant looked at websites that contained child pornography (which was not conclusive) and he downloaded images of child pornography onto his computer (also not conclusive). Again, while commending the district court's attempt to mitigate prejudice by ruling the images themselves inadmissible, we are con-

cerned that the jury heard that there were child pornography images but was not given any description of what the images contained. Considering that the appellant was accused of sexually abusing his four-year-old son, it is quite possible the jury assumed the images were of small children, perhaps boys, engaged in sexual behavior, which is not what the images depicted. Leaving theses facts to the imagination of the jury members likely was very prejudicial to the appellant. Not only did the jury hear about information that put the appellant in a bad light, but it also left the jury to speculate about what the facts actually were. This does not equate to a fair trial.

[¶ 28] Finally, the nude photos of the victim and his brother were not relevant or probative to show the appellant's motive for assaulting the victim. At the hearing, the State claimed the photos were relevant and probative to show the appellant had a "fetish with anal sex." On appeal, the State argued that the photos show that the appellant was sexually attracted to children—more specifically his child. Unfortunately, neither party designated the photos as part of the record on appeal, which makes it much more difficult to determine whether these photos are more sinister than innocent family photos. The district court found that:

> These images show the children taking baths or potty training. Other images, however, are more disturbing. Many of the offered images show E.A.M. and L.A.W. playing outdoors in the mud while nude, with mud smeared on the children's body and genitalia. Others show [the appellant] sitting in the bathtub with L.A.W. on his lap. At least three of the images focus on the children's genitals or buttocks. One picture shows a young child face down on a bed with his buttocks and hips extended up into the air.

Viewing this evidence in the light most favorable to admission, we still find that concluding these photos are relevant or probative to show that the appellant had a fetish with anal sex or that he was sexually attracted to the victim is far-fetched. Perhaps if the photos depicted the victim engaging in some sort of inappropriate behavior dealing with the but-

tocks area or showed the appellant engaging in some sort of sexually suggestive activity with the victim, we would find a different result. But the fact that even the district court leaves open the possibility that these photos may be innocent in nature demonstrates that an insinuation to the contrary would be more unfairly prejudicial to the appellant than what very minimal (if any) probative value the photos may have.

[¶ 29] We cannot find that admission of any of this evidence at trial was harmless. The State did not present overwhelming evidence of the appellant's guilt on the first-degree sexual abuse charge.[3] While we find, as explained below, that sufficient evidence was presented to sustain a conviction for first-degree sexual abuse, we also find that, if this evidence had not been admitted, there is a "reasonable possibility that the verdict might have been more favorable to the [appellant]." *Rolle,* 2010 WY 100, ¶ 9, 236 P.3d at 264 (quoting *Vigil,* 2010 WY 15, ¶ 11, 224 P.3d at 36). This evidence put the appellant in an extremely bad light in front of the jury because of conduct in which he may or may not have engaged, and while we cannot say that the evidence had a definitive impact on the verdict, we cannot say that it did not affect the way the jury perceived him or the evidence. For these reasons, we find that the admission of the websites and the photos of the victim and his brother, pursuant to W.R.E. 404(b), was prejudicial error.

### Whether the district court commented improperly upon the weight of the evidence

[¶ 30] Immediately before the DCI agent testified about his forensic investigation of the appellant's computer, the district court gave the jury the following instruction:

> During the trial pictures of the alleged victim and his brother were allowed into evidence depicting them without their clothes on. I believe you are about to hear evidence that there were child pornogra-

phy websites on the defendant's computer. This evidence is being admitted for a limited purpose. If you ultimately find beyond a reasonable doubt that the defendant committed one or more of the charged acts, you may consider the evidence pertaining to the naked photographs or the websites for the limited purpose of considering the defendant's motive, intent, knowledge, or presence or absence of mistake.[4]

The appellant argues that this instruction—specifically that the district court informed the jury that they would hear about child pornography websites—injected the district court's opinion regarding the weight or quality of the evidence at the trial.

[¶ 31] The appellant did not object to the instruction when given by the district court at trial; therefore, our review is limited to a search for plain error. *Walker v. State,* 2012 WY 1, ¶ 6, 267 P.3d 1107, 1110 (Wyo. 2012). "Plain error is established only 'when 1) the record is clear about the incident alleged as error, 2) there was a transgression of a clear and unequivocal rule of law, and 3) the party claiming error was denied a substantial right which materially prejudiced him.'" *Id.* (quoting *Black v. State,* 2002 WY 72, ¶ 7, 46 P.3d 298, 300 (Wyo.2002)).

[¶ 32] The record is clear that the district court's instruction stated that the jury was going to "hear evidence that there were child pornography websites on the [appellant's] computer[,]" satisfying the first part of the plain error standard. With respect to the second part of the standard, the appellant argues that the district court expressed an opinion regarding the evidence to the jury. The State counters that the district court's comment did not relate to the weight or value of the evidence and, instead, "was the introduction of a limiting instruction to prevent the jury from improperly using the evidence." While we agree with the State that the general tenor of the instruc-

---

3. On appeal, the State submits that the evidence of uncharged misconduct "pertained only to the single charge of first-degree sexual abuse."

4. This instruction exemplifies our concern with the imprecision in the admission of uncharged misconduct evidence under W.R.E. 404(b). This evidence was offered for the sole purpose of proving motive, yet the jury was instructed that it may be considered as proof of "motive, intent, knowledge, or presence or absence of mistake."

tion was meant to be a limiting instruction, we find that the district court's comment that the jury would hear that there were child pornography websites on the appellant's computer was a violation of a clear and unequivocal rule of law.

[¶ 33] We have expressed that trial judges must "be careful and cautious and not comment on the evidence." *Phillips v. State*, 597 P.2d 456, 458 (Wyo.1979) (quoting *In re Nelson's Estate*, 72 Wyo. 444, 266 P.2d 238, 261 (1954)).

> "We have repeatedly said that a judge, in the trial of a case before a jury, should abstain from expressing or indicating by word, deed or otherwise his personal views upon the weight or quality of the evidence. Expressions of opinion, or remarks, or comments upon the evidence which have a tendency to indicate bias on the part of the trial judge, especially in criminal cases, are regarded as an invasion of the province of the jury and prejudicial to an accused. [Citations omitted.]" *Spear v. Commonwealth*, 213 Va. 599, 194 S.E.2d 751, 753 (Va.1973).

*Id.* Here, the district court invaded the province of the jury by informing it that, before it heard any testimony from the DCI agent, it was going to hear evidence that there were child pornography websites on the appellant's computer. This statement was problematic because, as explained above, the evidence did not show that the appellant went to child pornography websites on his computer. At best there was a factual dispute as to whether the websites actually did contain child pornography. That issue should have been properly resolved by the jury. However, the district court informed the jury that the websites did contain child pornography. Therefore, the district court's statement was improper and a violation of a clear and unequivocal rule of law.

[¶ 34] We also find that the appellant was materially prejudiced by the district court's statement to the jury. Instead of the appellant being afforded the opportunity to dispute the evidence presented by the State, he was put at a significant disadvantage when the district court told the jury what the evidence was going to show. This is particularly prejudicial here, considering that the evidence did not, in fact, show that the appellant was visiting child pornography websites on his computer. We find that the district court's statement to the jury constituted plain error.

### *Whether the district court erred when it determined that the appellant's statement to Deputy Peech was given voluntarily*

[¶ 35] The appellant was interviewed immediately before and after his arrest by Deputy Peech with the Converse County Sheriff's Department. He claims that the statements he made during the interview were involuntary because he was fatigued, he was not free to leave, he was threatened by Deputy Peech, and he was subjected to coercive and psychological trickery when Deputy Peech appealed to his religious beliefs. While the appellant filed in the district court a motion to suppress his statement as involuntary, the motion was based only upon the total length of time of the interview. Thus, the substance of the appellant's claim, as presented in his appeal, is being brought for the first time before this Court. Therefore, we limit our review to a search for plain error. *Miller v. State*, 2009 WY 125, ¶ 10, 217 P.3d 793, 798 (Wyo.2009).

[¶ 36] It is clear from the record that the appellant was interviewed at length before and after his arrest, and the entire interview is part of the record on appeal before this Court. Further, the incidents that occurred during the interview, which the appellant alleges make his statement involuntary, are found in the record, either during the interview or in the appellant's testimony at trial. Therefore, the first part of the plain error standard of review has been satisfied.

[¶ 37] It is a clear and unequivocal rule of law that statements made by a defendant may not be used against him unless those statements were made voluntarily:

> Confessions, admissions, and statements are constitutionally required to be voluntary by the Fifth and Fourteenth Amendment[s] of the United States Constitution and by Art. 1, § 6 of the Wyoming Consti-

tution. *Lego v. Twomey,* 404 U.S. 477, 478, 92 S.Ct. 619, 621, 30 L.Ed.2d 618 (1972); *Black v. State,* 820 P.2d 969, 971 (Wyo.1991). The voluntariness requirement has been a part of the United States Supreme Court's constitutional jurisprudence since its decision in *Bram v. United States,* 168 U.S. 532, 542, 18 S.Ct. 183, 187, 42 L.Ed. 568 (1897). Additional constitutional requirements concerning voluntariness were imposed by the Court's decision in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), for custodial interrogations.

It is well established, however, that satisfying *Miranda* does not resolve the question of voluntariness. A confession may be found involuntary because of the means used to obtain it. *Coyote v. United States,* 380 F.2d 305, 310 (10th Cir.1967), *cert. denied,* 389 U.S. 992, 88 S.Ct. 489, 19 L.Ed.2d 484 (1967); *People v. Scott,* 198 Colo. 371, 600 P.2d 68, 69 (1979). A confession which is the product of either mental or physical coercion by the government is untrustworthy and cannot be used for any purpose in the trial of the case. In Wyoming, the State has the burden of proving by a preponderance of the evidence, under the totality of the circumstances, that a confession, admission or statement was given voluntarily. *Garcia v. State,* 777 P.2d 603, 606 (Wyo.1989); *Dodge v. State,* 562 P.2d 303, 308–09 (Wyo. 1977). Admission of an involuntary confession offends due process, whether or not the defendant was in custody when the confession was given. *Black,* 820 P.2d at 971 . . . .

. . . .

Statements are made voluntarily if they are the product of a citizen's free and deliberate choice rather than of governmental intimidation, coercion, or deception. *Bravo* [*v. State* ], 897 P.2d [1303], 1305 [ (Wyo.1995) ]. "Involuntariness requires coercive state action, such as trickery, psychological pressure, or mistreatment." *Withrow v. Williams,* 507 U.S. 680, 708, 113 S.Ct. 1745, 1762, 123 L.Ed.2d 407 (1993)) (O'Connor, J., concurring) (citing (*Colorado v. Connelly,* 479 U.S. 157, 167, 107 S.Ct. 515, 521, 93 L.Ed.2d 473 (1986)).

We have held that voluntariness must proceed from the spontaneous suggestion of the citizen's own mind, free from the influence of any extraneous disturbing cause. *Maki v. State,* 18 Wyo. 481, 487, 112 P. 334, 335 (1911). In *State v. Jones,* 73 Wyo. 122, 276 P.2d 445 (Wyo.1954), we quoted from Wharton on Criminal Evidence that "even a slight inducement held out by such a person [in a position of authority] renders the confession involuntary." *Jones,* 73 Wyo. at 144, 276 P.2d at 455; *see also Brady v. United States,* 397 U.S. 742, 753, 90 S.Ct. 1463, 1471, 25 L.Ed.2d 747 (1970) (similarly holding that even a slight inducement will render a statement involuntary). *Jones* quoted approvingly of a New Mexico decision:

> When direct or implied promises made by the person in authority are shown "the law cannot measure the force of the influence thereby produced; neither can the courts determine in what degree they affected the mind of the accused and to what extent they entered into his decision to confess. Hence, the rule is established that, ... confessions which are made [under such conditions] must be excluded."

*Jones,* 73 Wyo. at 141, 276 P.2d at 453 (quoting *State v. Dena,* 28 N.M. 479, 214 P. 583, 584 (1923)). Our later decisions summarize that a confession offends due process if the suspect's will was overborne by the police and the suspect's capacity for self-determination was seriously impaired. *Yung v. State,* 906 P.2d 1028, 1034 (Wyo. 1995). In Wyoming, coercive police tactics violate the due process clause of Wyo. Const. Art. 1, § 6 and statements elicited pursuant to these tactics may be suppressed. *Yung,* 906 P.2d at 1035. This Court has not yet decided whether coercion is a necessary predicate to finding that a confession is involuntary under our state constitution; however, coercive government activity is a necessary predicate to finding involuntariness within the due process clause of the Fourteenth Amendment. *Garcia,* 777 P.2d at 606. Once the evidence establishes state actor coercion, a court must consider the effect of that coer-

cion on the defendant's choice to confess or make an admission or statement. *Id.* Unless the court finds that coercive conduct caused the defendant to speak, the court must find the statement to be voluntary and the statement is admissible. *Id.* We recognize that coercion can be mental as well as physical. *Id.* The use of tricks or factual misstatements in and of themselves does not render a confession involuntary. *Id.*

. . . .

Relevant factors concerning the characteristics of the accused and the details of the interrogation include:

whether the defendant was in custody or was free to leave and was aware of the situation; whether *Miranda* warnings were given prior to any interrogation and whether the defendant understood and waived *Miranda* rights; whether the defendant had the opportunity to confer with counsel or anyone else prior to the interrogation; whether the challenged statement was made during the course of an interrogation or instead was volunteered; whether any overt or implied threat or promise was directed to the defendant; the method and style employed by the interrogator in questioning the defendant and the length and place of the interrogation; and the defendant's mental and physical condition immediately prior to and during the interrogation, as well as educational background, employment status, and prior experience with law enforcement and the criminal justice system.

*People v. Gennings,* 808 P.2d 839, 845 (Colo.1991); *see also Yung,* 906 P.2d at 1034; *Witt v. State,* 892 P.2d 132, 139–40 (Wyo.1995); *Vigil v. State,* 859 P.2d 659, 665 (Wyo.1993); *Dice v. State,* 825 P.2d 379, 386 (Wyo.1992); *Black,* 820 P.2d at 971–72; *Garcia,* 777 P.2d at 607; *Stone [v. State ],* 745 P.2d [1344], 1348 [ (Wyo. 1987) ]; *Frias v. State,* 722 P.2d 135, 142 (Wyo.1986).

*Carter v. State,* 2010 WY 136, ¶ 15, 241 P.3d 476, 484–86 (Wyo.2010) (quoting *State v. Evans,* 944 P.2d 1120, 1124–26 (Wyo.1997)).

[¶ 38] The appellant argues that, under the totality of the circumstances of his interview, the statements he made to Deputy Peech were involuntary. Specifically, he claims that he was fatigued at the time of the interview; before he was officially arrested he was not free to leave the interview; and he was subjected to psychological coercion and threats when Deputy Peech appealed to his religious beliefs.[5] We find that none of these factors, when viewed under the totality of the circumstances, rendered the statements he made in the interview involuntary.

[¶ 39] First, the appellant claims that he was tired when he arrived for the interview because he had only gotten approximately four hours of sleep the night before. As pointed out in *Carter,* "[w]e have recognized that sleep deprivation . . . [is a] factor[ ] which can make a statement involuntary." *Carter,* 2010 WY 136, ¶ 16, 241 P.3d at 486. The appellant in *Burnett v. State,* 997 P.2d 1023, 1026 (Wyo.2000), made a similar argument, claiming her statement was involuntary because she had gotten little sleep the night before. We rejected this argument, however, explaining that even if she had gotten little sleep, it was not due to coercive state action. *Id.* The same is true here. The appellant may have been tired from getting little sleep the previous night, but he has not alleged that the fatigue was due to coercive state action, nor has he provided us any case law that would suggest we should depart from out precedent in *Burnett.*

[¶ 40] The appellant next argues that he was not free to leave during the interview, which is a circumstance that shows his statement was involuntary. For the first half of the interview, Deputy Peech clearly informed the appellant that he was not under arrest, and despite that fact, he still advised the appellant of his rights pursuant to *Miranda.*

5. In his brief, the appellant also claims Deputy Peech threatened to tell the prosecutor that the appellant was a psychopath. The appellant has not supported this claim with any independent argument, and essentially relies upon the same information as alleged regarding the religious psychological coercion. As such, we consider it part of the alleged religious psychological coercion.

While the appellant testified at trial that he asked Deputy Peech if he could leave and was told he could not, the recording of the interview does not give any indication that the appellant was not free to leave before he was arrested. Furthermore, assuming, *arguendo,* he was not free to leave, there is no evidence that the statement was not made voluntarily. As mentioned above, the appellant was informed that he had the right to remain silent and that he had the right to an attorney. The appellant stated that he understood those rights, yet chose to speak with Deputy Peech.

[¶ 41] Finally the appellant claims that Deputy Peech subjected him to psychological coercion and threats by appealing to his religious beliefs. Just short of two hours into the interview, Deputy Peech started making comments to the appellant regarding God, forgiveness, and leniency given to those who choose to tell the truth. These statements included Deputy Peech telling the appellant that he wanted to be able to tell everybody that: "[Peech] looked in[to] [the appellant's] eyes, [Peech] saw his soul, and he was telling the truth. And [Peech] saw, similar, 'cuz no one can be the same as God, [Peech] saw similar to what God was seeing in him[.]'" Deputy Peech also told the appellant that he is "God's Instrument."

[¶ 42] No Wyoming case has dealt with the specific issue of whether an interrogator may use a suspect's religious beliefs to attempt to elicit a statement. However, courts from other jurisdictions have had the occasion to determine whether these types of appeals render a statement involuntary. Some courts have looked disapprovingly upon the tactic, ultimately holding the statements inadmissible. *See People v. Adams,* 143 Cal.App.3d 970, 989, 192 Cal.Rptr. 290 (5th Dist.1983), *disapproved of on other grounds by People v. Hill,* 3 Cal.4th 959, 13 Cal.Rptr.2d 475, 839 P.2d 984, 995 n. 5 (1992) ("Religious beliefs are not matters to be used by governmental authorities to manipulate a suspect to say things he or she otherwise would not say. The right to worship without fear is too precious a freedom for us to tolerate an invasion and manipulation by state officials of the religious belief of individ-

uals, including those accused of crime."); *State v. Wood,* 128 S.W.3d 913, 918 (Mo.Ct. App.2004) (Strategically selecting an interrogator for the purpose of exploiting the religious relationship between the interrogator and the defendant was a violation of the defendant's due process rights.). A significant number of courts have held to the contrary that references to religion did not make a statement or confession involuntary. *See State v. Newell,* 212 Ariz. 389, 132 P.3d 833, 844 (2006) (no evidence that the religious references caused the defendant's will to be overborne); *Noble v. State,* 319 Ark. 407, 892 S.W.2d 477, 482 (1995), *overruled on other grounds by Grillot v. State,* 353 Ark. 294, 107 S.W.3d 136 (2003) (An appeal to religious sympathies does not automatically make a statement involuntary—only upon a showing that his free will was overborne.); *Rodgers v. Commonwealth.,* 227 Va. 605, 318 S.E.2d 298, 303 (1984) (Religious appeals are only one part of the totality of the circumstances.); *State v. Loosli,* 130 Idaho 398, 941 P.2d 1299, 1301 (1997) (Defendant's will was not overborne when officers told him that he would not be forgiven by God if he did not tell the truth.). Regardless of whether the courts ultimately found the statements voluntary or involuntary, the cases all have one thing in common—the analysis focuses on the totality of the circumstances.

[¶ 43] We do not find that, under the totality of the circumstances of this case, the appellant's free will was overborne by Deputy Peech's statements regarding God, leniency, and forgiveness. Perhaps if the record showed that the appellant had such a religious nature that his free will likely was overborne by the deputy's claims that he could see into the appellant's soul and that the deputy was "God's Instrument," we would be inclined to find this confession involuntary. But that is not what the record shows. Deputy Peech was not appealing to a specific religion or trying to appeal to particular vulnerabilities known to him. Instead, the record shows that the appellant was twenty-three years old at the time, a high school graduate with some technical training, was gainfully employed, and supporting a family of four. While the appellant now claims that he was extremely fatigued, there

is nothing in the interview that shows that to be the case. The appellant never asked to end the interview, or complained about being tired. He also continually denied the allegations against him in the midst of the religious references made by Deputy Peech. At the time the references were made, the appellant was aware that he was not under arrest and had been informed of his *Miranda* warnings. During the interview, the appellant made statements that certainly were not in his best interest; however, we cannot say those statements were the product of "trickery, psychological pressure, or mistreatment." *Carter*, 2010 WY 136, ¶ 15, 241 P.3d at 485. The appellant has failed to demonstrate that his statement was involuntary and in violation of a clear and unequivocal rule of law, and has thereby failed to demonstrate that plain error occurred.

### Whether plain error occurred when Deputy Peech expressed his opinion that the appellant was lying during the interview

[¶ 44] The appellant claims that the prosecutor improperly commented upon the credibility of the appellant in his opening and closing statements. He further claims that, at trial, Deputy Peech improperly expressed his opinion that the appellant was lying during the interview, which was exacerbated by the fact that the jury listened to portions of the interview, wherein Deputy Peech repeatedly accused the appellant of lying. An analysis of this issue is somewhat complicated by the fact that defense counsel did not object to the opening and closing statements, nor did he object to the playing of portions of the interview for the jury at trial. In fact, defense counsel actually played portions of the interview before the prosecutor did. However, defense counsel did object to the following exchange at trial:

6. The time may have come where this Court should re-evaluate its plain error review standard and consider whether it should not also include an analysis of errors that seriously affect the fairness of the trial or the integrity of judicial proceedings, whether or not the defendant is able to prove specific prejudice. *See* Jeffrey L. Lowry, *Plain Error Rule—Clarifying Plain Error*

[PROSECUTOR]: Mr. Peech, you say that total first day was roughly 4, 4 and a half hours?

[PEECH]: Yes, sir.

Q. Can you tell us why you went that long?

A. He was not telling us the truth. We would get a little truth—he would deny stuff—

[DEFENSE COUNSEL]: Objection. This answer is speculative and is a guess.

[PROSECUTOR]: I'm asking why he conducted the interview so long. He can refrain from saying whether it was the truth or not.

THE COURT: Well, insofar as the defendant admitted that he wasn't telling the truth, you can answer that—you can talk about that.

In terms of your general opinion, the jury will disregard any general opinions, because the jury is the sole judge of the credibility of the witnesses.

With that ruling, go ahead.

Both parties submit that plain error is the appropriate standard of review, but neither party acknowledges that at least part of this claim was brought to the district court's attention. Nonetheless, we review the claim in its entirety under the plain error standard of review because, even under that onerous standard, we find the jury was exposed to improper comments regarding the appellant's credibility, and those comments were unfairly prejudicial to the appellant.[6]

[¶ 45] First, we find that the record is clear as to the alleged error. The statements made by the prosecutor clearly appear in the record, and the transcript reflects, as quoted above, Deputy Peech's comment that the appellant "was not telling us the truth." With respect to the interview, the State argues that the portion of the interview played for the jury is not clearly reflected in the

*Analysis Under Rule 52(b) of the Federal Rules of Criminal Procedure*, 84 J.Crim. L. & Criminology, 1065 (1994). The underlying concept is that the failure to interpose a timely objection, for instance, may result in a forfeiture of that right, but forfeiture does not equate to waiver and it does not extinguish the error. *Id.* at 1072.

record and, therefore, we cannot make a determination on the issue. While the record does not pinpoint to the exact second what parts of the interview were played for the jury, the trial transcript reflects that the interview was played for the jury beginning at the one hour and thirty minute mark. Further, defense counsel represented that approximately an hour and a half of the interview was going to be played. Therefore, we find that the record shows what portions of the interview were played for the jury.

[¶ 46] As pointed out in *Sweet v. State*, 2010 WY 87, ¶¶ 23–24, 234 P.3d 1193, 1202–03 (Wyo.2010), this Court has a long-standing rule that a witness may not give an opinion regarding the truthfulness or credibility of the accused, the victim, or any other witness. We find that this clear and unequivocal rule of law was violated here, although not in each circumstance raised by the appellant.

[¶ 47] First, we do not find that the statements made by the prosecutor in his opening and closing statements were commenting upon the appellant's credibility. "We review allegations of prosecutorial misconduct by reference to the entire record." *Whitney v. State*, 2004 WY 118, ¶ 85, 99 P.3d 457, 485 (Wyo.2004) (internal quotation marks and citation omitted). With specific regard to opening statements, we have said:

An opening statement has a narrow purpose and scope. It is to state what evidence will be presented, to make it easier for the jurors to understand what is to follow, and to relate parts of the evidence and testimony to the whole; it is not an occasion for argument.

. . . .

Further, the prosecutor's opening statement should be confined to a statement of the issues in the case and the evidence the prosecutor intends to offer which the prosecutor believes in good faith will be available and admissible.

*Id.* at ¶ 86, at 485–86 (internal citations and quotation marks omitted).

[¶ 48] Here, in his opening statement, the prosecutor stated: "Within two hours and 3 minutes, the [appellant] admits it. After telling Mr. Peech several times he wasn't being truthful, Mr. Peech kept asking, and ultimately the defendant told him he did." Although the statement somewhat focused on the appellant being untruthful, it was based upon what the evidence was going to show—specifically statements made by the appellant during the interview where he admitted he was not being truthful. This was not a circumstance where the prosecutor was expressing his personal opinion on the appellant's credibility to the jury. The prosecutor had a good faith basis that this evidence would be available, as the district court had previously ruled that the statement was made voluntarily.

[¶ 49] "Closing arguments must be based upon the evidence submitted to the jury. The purpose of closing argument is to allow counsel to offer ways of viewing the significance of the evidence." *Whitney*, 2004 WY 118, ¶ 87, 99 P.3d at 486. The appellant complains that the following part of the prosecutor's closing argument constituted a comment upon the appellant's credibility:

[PROSECUTOR]: Now, remember you heard parts of that interview. You heard parts of that interrogation. Officer Peech told him time and again, "Tell me the truth. Tell me the truth." He said it over and over again. And put yourself into a reasonable person's position under the circumstances. I asked Dr. Denison, "If Officer Peech tells me that he's the voice of God or, 'You need to confess to me as a representative of God,' or whatever it was, can I tell him to fly a kite? Can I tell him to pound sand? . . . ."

A review of this passage in the context of the entire record, and specifically the rest of the closing argument, demonstrates that the prosecutor was responding to the appellant's assertions that the statements he made in his interview were coerced. The prosecutor was using the evidence presented at trial—through the statement itself and Dr. Denison's testimony—that the appellant could have ceased the interview at any time and, thus, the statements were voluntary. To that extent, we do not find that the prosecutor's argument constituted a comment upon the appellant's credibility.

[¶ 50] However, we do find that Deputy Peech's testimony was impermissible opinion evidence regarding the appellant's credibility. On direct examination, Deputy Peech unequivocally testified that the interview lasted as long as it did because "[the appellant] was not telling us the truth. We would get a little truth—he would deny stuff—." The State argues that Deputy Peech was actually trying to assert that the appellant himself had admitted to lying during the interview. We disagree. The transcript clearly demonstrates that his response to the question was that he believed the appellant was lying, and only after the district court advised the jury that it could not consider opinion testimony did Deputy Peech focus on the appellant's statements.

[¶ 51] Considering the brief nature of the incident and the immediate instruction given by the district court, under most circumstances this error might be considered harmless. However, here, Deputy Peech's opinion was exacerbated when the jury listened to approximately an hour and a half of Deputy Peech's interview with the appellant, where he constantly accused the appellant of being dishonest. In *Sweet*, we held that playing an interview that contained these types of statements for the jury amounted to plain error. *Sweet*, 2010 WY 87, ¶¶ 28–36, 234 P.3d at 1204–06.

[¶ 52] The State encourages this Court to adopt the Kentucky Supreme Court's conclusion in *Lanham v. Commonwealth*, 171 S.W.3d 14 (Ky.2005), that an audiotape of an interrogation or interview that contains repeated accusations that a suspect is lying should be admissible. The Kentucky Supreme Court concluded that accusing a suspect of lying is a valid interrogation technique, is no different from an officer testifying that the defendant changed his story, and that a proper instruction would alleviate any danger associated with playing the interrogation. *Id.* at 27, 29. This is the same authority the State relied upon in advancing this same argument in *Sweet*, which we rejected. *Sweet*, 2010 WY 87, ¶ 30, 234 P.3d at 1205. Just as in *Sweet*, Deputy Peech did not explain to the jury that accusing a suspect of lying is normal interrogation

technique and that such an accusation does not mean that the suspect actually is lying. Therefore, we find it unlikely that the jury would know why the appellant was accused of lying, other than he actually was lying.

[¶ 53] When determining whether material prejudice is present, we review the evidence in light of the entire record. *Pendleton v. State*, 2008 WY 36, ¶ 11, 180 P.3d 212, 216 (Wyo.2008).

> When the error concerns the admission of improper evidence, among the considerations are:
>
> > (1) whether the evidence furnished important corroboration of other testimony; (2) whether it related to a material, consequential fact; (3) whether counsel relied on the evidence in argument; (4) whether the evidence was cumulative; and (5) the effect of any instructions given to the jury. 1 Weinstein's Evidence, ¶ 103[06] (1986).
>
> *Zabel* [*v. State*], 765 P.2d [357], 362 [ (Wyo.1988) ]. We have recognized that "perhaps the single most significant factor in weighing whether an error was harmful is the strength of the case against the defendant." *Id.* (quoting 3B Charles A. Wright, Nancy J. King, Susan R. Klein & Peter J. Henning, *Federal Practice and Procedure* § 854 at 305 (2d ed.1982)).

*Sweet*, 2010 WY 87, ¶ 31, 234 P.3d at 1205. Here, the State's case against the appellant was not particularly strong. With the exception of two contested pieces of physical evidence, the entire case hinged on the victim's allegations and the appellant's denial of those allegations. Therefore, the credibility of the victim and the appellant were of utmost importance in the jury deliberations in the case.

[¶ 54] Even though credibility was a major issue for the jury, we still express some reluctance to find prejudice. This is based primarily on the fact that, while Deputy Peech's troublesome testimony was given during the State's direct examination, the interview tape was played while he was being cross-examined by defense counsel. The State argues that the appellant should not be allowed to profit from his counsel's strategic decision regarding the use of the interview. The State argues that these facts are similar

to those in *Pendleton*, where this Court found prejudice had not been established because defense counsel advocated for the admissibility of the interview recording. *See Pendleton*, 2008 WY 36, ¶¶ 12, 16, 17, 180 P.3d at 217–18. The appellant argues that this case is unlike *Pendleton* because defense counsel attempted to have the interview suppressed in its entirety and only used the interview after Deputy Peech commented upon the appellant's credibility.

[¶ 55] In *Sweet*, we recognized that prejudice can be established even where defense counsel relied upon an interview recording wherein the investigating officer repeatedly commented upon the credibility of the defendant and the victim. *Sweet*, 2010 WY 87, ¶ 34, 234 P.3d at 1206. We reasoned that, "[w]hile Sweet relied on the recorded interview to show his repeated denials of the deputy's accusations, he had little choice since the court had denied his suppression motion. In that respect, this case is distinguishable from *Pendleton* in which the defendant advocated for the admissibility of the recorded interview." *Id*. The situation here is similar to that in *Sweet*. Defense counsel filed a motion to suppress the interview, but was unsuccessful. Therefore, defense counsel needed to do the best he could with potentially damaging information that he had previously tried to keep the jury from hearing.

[¶ 56] The difference here, of course, is that defense counsel, not the prosecutor, chose to play the recording for the jury. However, in its opening statement, the State told the jury that it would hear several portions of the interview, and during direct examination, Deputy Peech testified at length that the appellant told him that he was being untruthful and that he inappropriately touched the victim. Generally, "we are not willing to second-guess counsel and suggest that a different strategy might have been more productive." *Pendleton*, 2008 WY 36, ¶ 17, 180 P.3d at 218. A review of the entire record in this case shows that, just as in *Sweet*, defense counsel was left with little choice but to attempt to exploit the interview after the district court denied the motion to suppress. And while the appellant may have

been the first to use the interview, we cannot say that he "advocated for its admissibility." *Id*. at ¶ 12, at 217.

[¶ 57] Under most circumstances, we may find that defense counsel's active use of the interview would negate any prejudice to the appellant. But here, defense counsel was faced with two options: to cross-examine Deputy Peech knowing that he could not necessarily discredit any of his testimony because it technically was all contained in the interview; or use the interview in an attempt to demonstrate that the appellant's "confession" was not quite as clear as Deputy Peech testified and to try to convince the jury that the interview was unfair and caused the appellant to "confess" to crimes he did not commit. Both of these options exposed the jury to Deputy Peech's "opinion" regarding the appellant's credibility. While it is a close call, we find that, based upon the entire record in this case, there is a reasonable possibility that the outcome of the trial may have been more favorable absent Deputy Peech's testimony regarding the appellant's credibility. While an officer's accusation that a suspect is lying may be an appropriate and effective interrogation technique, it has no place in a court of law.

### Whether plain error occurred when the district court instructed the jury that there need be no corroboration of the victim's testimony in order to convict the appellant

[¶ 58] The appellant argues that the district court erred when it gave the jury Instruction 16A, which stated: "Corroboration of a victim's testimony is not necessary to obtain a conviction for sexual assault." The appellant did not object to this instruction at trial and, therefore, we review for plain error. *Counts v. State*, 2012 WY 70, ¶ 44, 277 P.3d 94, 107 (Wyo.2012).

[¶ 59] Since we have already found reversible error in several other issues in this appeal, we will simply note that this Court has previously found this instruction inappropriate and have cautioned the district courts to refrain from giving it. *Sweet*, 2010 WY 87, ¶ 39, 234 P.3d at 1206; *Garza v. State*, 2010 WY 64, ¶ 21, 231 P.3d 884, 891 (Wyo.2010);

*Story v. State*, 721 P.2d 1020, 1044–46 (Wyo. 1986). On retrial of this case, the trial court shall not give this jury instruction.

### Whether the State presented sufficient evidence to sustain each of the convictions

[¶ 60] The appellant claims that the State failed to present sufficient evidence to sustain his conviction for first-degree sexual abuse of a child and for the eight counts of second-degree sexual abuse of a child. Although we are reversing all of the appellant's convictions for various other grounds, "we must also determine whether the evidence was sufficient to convict Appellant because, if the evidence was insufficient as a matter of law, Appellant is entitled to be acquitted on the charge, and the State may not re-try him." *Jones v. State*, 2011 WY 114, ¶ 19, 256 P.3d 527, 534 (Wyo.2011). When reviewing a sufficiency of the evidence claim, we use the following standard of review:

> [W]e must determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. When considering a claim of the sufficiency of the evidence, we review that evidence with the assumption that the evidence of the prevailing party is true, disregard the evidence favoring the unsuccessful party, and give the prevailing party the benefit of every favorable inference that we may reasonably draw from the evidence. We will not reweigh the evidence nor will we re-examine the credibility of the witnesses.

*Counts*, 2012 WY 70, ¶ 52, 277 P.3d at 109 (quoting *Garner v. State*, 2011 WY 156, ¶ 20, 264 P.3d 811, 820 (Wyo.2011)).

### First–Degree Sexual Abuse

[¶ 61] The appellant argues that the State presented insufficient evidence to

convict him of first-degree sexual abuse of a child.[7] However, the appellant's argument solely is based upon his belief that the jury gave improper weight to particular testimony or evidence. As mentioned above, when determining whether the evidence is sufficient to sustain a conviction, "[w]e will not reweigh the evidence nor will we re-examine the credibility of the witnesses." *Counts*, 2012 WY 70, ¶ 52, 277 P.3d at 109.

[¶ 62] When we review the evidence using the proper standard of review, we conclude that the jury was presented with sufficient evidence to sustain the conviction. The victim, a four-year-old child at the time of the crime, testified that "[the appellant] put his wiener in my butt hole[,]" and that allegation was repeated during the sexual assault nurse examiner's testimony when she explained that the victim said, "Daddy puts his peepee in my butt hole. And it itches, and it scratches, and it hurts." The nurse also testified that, during her examination, the victim's anus dilated instantly and she found a healing area on the anus. In her opinion, these findings supported the victim's allegation. Additionally, a forensic analyst from the state crime lab testified that she tested a fluid on the victim's pajama pants, which indicated the possible presence of blood on the pajamas. There was a mixture of DNA in the spot, and she was unable to exclude the victim or the appellant as possible contributors to the DNA. From this evidence, a rational trier of fact could find that the appellant engaged in sexual intrusion with the victim, who was his four-year-old stepson.

### Second–Degree Sexual Abuse

[¶ 63] The appellant also argues that the State failed to present sufficient evidence to sustain his convictions for the eight counts of second-degree sexual abuse of a child.[8] Specifically, the appellant claims

---

7. The appellant was charged and convicted of sexual abuse of a minor in the first degree, in violation of Wyo. Stat. Ann. § 6–2–314(a)(ii) (LexisNexis 2011), which states:

    (a) An actor commits the crime of sexual abuse of a minor in the first degree if:
      (ii) Being eighteen (18) years of age or older, the actor inflicts sexual intrusion on a victim

who is less than eighteen (18) years of age, and the actor is the victim's legal guardian or an individual specified in W.S. 6–4–402[.]

8. The appellant was charged and convicted of sexual abuse of a minor in the second degree, in violation of Wyo. Stat. Ann. § 6–2–315(a)(iii) (LexisNexis 2011), which states:

that the State failed to prove that the appellant's contact with the victim was "with the intention of sexual arousal, gratification or abuse[ ]" as required by Wyo. Stat. Ann. § 6–2–301(a)(vi) (LexisNexis 2011). After a careful review of the record, we agree that the State failed to provide sufficient evidence to sustain the appellant's convictions for second-degree sexual abuse.

[¶ 64] While the appellant's brief focuses on the lack of evidence demonstrating his contact with the victim was for the purpose of sexual arousal, gratification or abuse, we are concerned with the fact that there is no evidence, other than the statements made by the appellant in his interview, to support a charge of second-degree sexual abuse. Whether the State provided any evidence of criminal conduct, other than the appellant's extrajudicial statement, is a legal issue that the appellant did not raise in his brief. To that extent

> [w]e are sensitive to the proposition that judicial restraint generally demands that we address only those issues properly before us and preserved for our review. We also know that it is within our jurisdiction to decide any case as justice may demand.... [J]udicial efficiency strongly suggests the treatment of obvious matters in the first appeal.

*Sheeley v. State,* 991 P.2d 136, 138 (Wyo. 1999). Here, although not directly raised by the appellant, we believe this question is properly encompassed within the question of whether sufficient evidence was presented at trial to sustain the jury's decision.

[¶ 65] In Wyoming, "independent proof of the *corpus delicti* must exist apart from a defendant's extrajudicial confession or admission[.]" *Jones v. State,* 2010 WY 44, ¶ 11, 228 P.3d 867, 870 (Wyo.2010). *See also Simmers,* 943 P.2d at 1199; *Kolb v. State,* 930 P.2d 1238, 1248 (Wyo.1996); *Betzle v. State,* 847 P.2d 1010, 1021–22 (Wyo.1993); *Konopisos v. State,* 26 Wyo. 350, 354–55, 185 P. 355, 356 (Wyo.1919). In *Simmers,* we

identified what type of evidence must exist to prove a crime was committed:

> [The] corroborating evidence need only consist of substantial evidence that the offense has been committed, so that the evidence as a whole proves beyond a reasonable doubt that the defendant is guilty of the crime charged.

> [C]orroborating evidence is adequate if it supports the essential facts admitted sufficiently to justify a jury inference of the truth of the confession. The quantity and type of independent corroborating evidence depends upon the facts of each case. However, circumstantial evidence can be used to corroborate a confession.

*Simmers,* 943 P.2d at 1199 (internal citations and quotation marks omitted).

[¶ 66] We have carefully analyzed all of the trial transcripts and cannot find any evidence, direct or circumstantial, that corroborates that the appellant ever engaged in any sexual contact with the victim, other than the conduct that was the basis of the first-degree count. There was never an allegation made by the victim or his mother at trial, or to any of the multiple medical care providers or the forensic interviewer, that the appellant engaged in sexual contact with the victim. There was no testimony indicating that the victim had been subjected to sexual abuse over a period of time. Instead, all of the evidence, other than Deputy Peech's testimony regarding the appellant's interview, focused on the single allegation of penetration. The State's brief regarding the sufficiency of the evidence on this count also focuses only on the statements the appellant made in his interview with Deputy Peech. Further, in its "Statement of the Facts" the State represents that: "All of the evidence incriminating [the appellant] for his second-degree sexual abuse of [the victim] came from his own statements to investigators." The appellant's statements, on their own, are insuffi-

---

(a) Except under circumstance[s] constituting sexual abuse of a minor in the first degree as defined by W.S. 6–2–314, an actor commits the crime of sexual abuse of a minor in the second degree if:

(iii) Being eighteen (18) years of age or older, the actor engages in sexual contact with a victim who is less than eighteen (18) years of age and the actor is the victim's legal guardian or an individual specified in W.S. 6–4–402[.]

cient to uphold his convictions for second-degree sexual abuse. Therefore, this Court reverses the eight counts of second-degree sexual abuse, and on remand the district court shall enter a judgment of acquittal on those counts.

### Whether the appellant received ineffective assistance of trial counsel

[¶ 67]   The appellant's final claim is that he received ineffective assistance of counsel in three respects.  First, he claims that trial counsel was ineffective for not arguing at the competency hearing that the victim's testimony was also tainted.  Second, he argues that trial counsel was ineffective for not arguing that the appellant's statement was involuntary for the reasons he has raised in this appeal.  *See supra* ¶¶ 35–41.  Finally, he argues that trial counsel was ineffective for failing to request a jury instruction that would have instructed the jury to disregard any testimony regarding Deputy Peech's opinion of the appellant's credibility.

[¶ 68]   Claims of ineffective assistance of trial counsel are reviewed *de novo*.  *Proffit v. State*, 2008 WY 114, ¶ 33, 193 P.3d 228, 241 (Wyo.2008).  There are two requirements the appellant must show before prevailing on a claim of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Maier v. State*, 2012 WY 50, ¶ 24, 273 P.3d 1084, 1091 (Wyo.2012) (quoting *Dickeson v. State*, 843 P.2d 606, 609 (Wyo.1992)).

[¶ 69]   First, because we have found that the appellant is entitled to a new trial due to errors regarding the victim's competency to testify, and error in Deputy Peech's comments upon the appellant's credibility, we need not consider whether the appellant received ineffective assistance of counsel for not raising the issue of taint at the competency hearing or requesting a jury instruction regarding Deputy Peech's testimony.  Second, we find that trial counsel was not ineffective for challenging the voluntariness of the appellant's statement based solely on the length of the interview, and not raising the issues of fatigue, threats, and psychological coercion.  We considered those issues when we concluded that the appellant's statements were given voluntarily.  *See supra* ¶¶ 42–43.  Therefore, even if trial counsel had brought these issues to the attention of the district court, the motion would have been unsuccessful.  Counsel cannot be deemed ineffective for failing to bring a motion that would have been denied.  *Carter*, 2010 WY 136, ¶ 15, 241 P.3d at 484 (citing *Dettloff v. State*, 2007 WY 29, ¶¶ 17–19, 152 P.3d 376, 382–83 (Wyo.2007) (If a suppression motion would have been brought, but denied, the defendant suffers no prejudice from the failure to bring such a motion.)).

### CONCLUSION

[¶ 70]   As this Court has long recognized, the United States and Wyoming constitutions do not guarantee that a criminal defendant receive a perfect trial, but they do guarantee that he receive a fair trial.  *See Eaton v. State*, 2008 WY 97, ¶ 85, 192 P.3d 36, 75 (Wyo.2008); *Haworth v. State*, 840 P.2d 912, 920 (Wyo.1992); *Janski v. State*, 538 P.2d 271, 277 (Wyo.1975).  When applying that maxim, many errors that may occur at trials are not so pervasive as to deprive a defendant of his constitutionally guaranteed right.  Unfortunately, we cannot say that is the case here.  The appellant's trial contained sufficient errors that it would be an affront to the criminal justice system to say this trial was fair.  We must remember that:

> " * * * Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly.  An inscription on the walls of the Department of Justice states the proposition candidly for the federal domain: 'The United States wins its point

whenever justice is done its citizens in the courts.' "

*Sheeley,* 991 P.2d at 139 (quoting *Stephens v. State,* 774 P.2d 60, 63 (Wyo.1989), *overruled in part on other grounds by Large v. State,* 2008 WY 22, 177 P.3d 807, 816 (Wyo.2008)) (quoting *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215 (1963)).

[¶ 71]   We reverse the appellant's convictions and remand to the district court for a new trial, consistent with this opinion.

VOIGT, J., delivers the opinion of the Court; BURKE, J., files a concurring in part and dissenting in part opinion, in which KITE, C.J., joins.

BURKE, Justice, concurring in part and dissenting in part, with whom KITE, Chief Justice, joins.

[¶ 72]   Appellant identified eight appellate issues.   I disagree with the majority's resolution of several of those issues.   Ultimately, however, I agree that all of Appellant's convictions must be reversed because of error related to the admission of evidence concerning the pornographic websites.[9]   Although Appellant's convictions for Counts Two through Nine should be reversed, I cannot agree with the majority's conclusion that there was insufficient evidence to support those convictions.   I will address that issue first.

**Sufficiency of the Evidence (Counts Two through Nine)**

[¶ 73]   The jury convicted Appellant of eight counts of second-degree sexual abuse. The majority applied the *corpus delicti* rule and concluded that there was insufficient evidence to support the convictions.   As a result, Appellant cannot be prosecuted again for those alleged crimes.   *Granzer v. State,* 2008 WY 118, ¶ 23, 193 P.3d 266, 272 (Wyo. 2008).   I dissent from that portion of the majority opinion for two reasons: First, the *corpus delicti* rule was not raised by Appellant and should not be considered by this

Court.   Second, if properly applied, the *corpus delicti* rule does not mandate reversal of the convictions.

[¶ 74]   As a general proposition, we address only those issues properly before us and preserved for our review.   Appellant's contention that there was insufficient evidence to support the eight convictions for second-degree sexual abuse focused solely upon the sexual gratification element of the offense.   According to Appellant, "[T]here is no evidence that Adam touched L.W. with the requisite intent of sexual gratification." Appellant's entire argument on this issue is less than one-half of a page.   Appellant never mentions the term *corpus delicti,* does not address how the rule is properly applied in cases such as this, and fails to provide the State with any notice that he is relying on the *corpus delicti* rule to support his claim.

[¶ 75]   Appellant did raise the issue in his Motion for Judgment of Acquittal filed after trial.   The district court denied the motion stating:

The Defendant alleges, however, that such out of court confessions were not true, made under duress, and needed to be corroborated pursuant to *Jones v. State,* 228 P.3d 867 (Wyo.2010).

It should be first noted that the issue of corroboration was not raised at trial by way of a motion for judgment of acquittal or by any proffered jury instructions.

However, the Court is of the opinion that there was substantial corroborative evidence.

"Corroborating evidence is adequate if it supports the essential facts admitted to justify a jury inference of the truth of the confession." *Jones v. State,* 228 P.3d 867, 870 (Wyo.2010).

First, there were confessions by the Defendant to not 1 but 8 separate acts and the confessions were recorded.   Secondly, the jury concluded that there was proof beyond a reasonable doubt that the Defendant had committed a 1st degree sexual assault on LAW. Thirdly, there was undis-

---

9.   I also agree that: (1) There was sufficient evidence to support Appellant's conviction on Count I;  (2) Appellant failed to establish that his confession was involuntary;  (3) It was error to give the "no corroboration of victim's testimony is necessary" instruction;  and (4) Appellant did not establish ineffectiveness of defense counsel.

puted testimony and pictures that the Defendant had indeed bathed and showered with LAW, which is where the sexual contact had allegedly occurred.

Lastly, I believe the jury could conclude that Mrs. Mersereau had significant suspicions that some inappropriate conduct had occurred.

Danielle Mersereau's decision to quiz LAW about whether his step-father had molested LAW based on a random TV show seems dubious at best. Her decision to take LAW to a physician's assistant for an exam would seem unnecessary if she were convinced nothing occurred. Finally, LAW's knowledge of the Defendant "sticking his peepee in my butthole", does not seem to be an expression that a 5 year old would be familiar with.

The Court concludes that there was enough corroborating evidence to sustain a verdict on the 2nd degree claims.

Appellant does not challenge that ruling in this appeal.

[¶ 76] Because the issue was not raised by Appellant, the State has had no opportunity to address the issue, to identify corroborating evidence in the record, or to apply our precedent to the facts of this case. The majority reaches its decision without any input from either party on this issue.[10] The danger of reaching the incorrect result without input from the parties is exacerbated by the case-specific nature of the *corpus delicti* rule: "[C]orroborating evidence is adequate if it 'supports the essential facts admitted sufficiently to justify a jury inference of the truth' of the confession. **The quantity and type of independent corroborating evidence depends upon the facts of each case.** However, circumstantial evidence can be used to corroborate a confession." *Simmers*, 943 P.2d at 1199 (quoting *United States v. Clark*, 57 F.3d 973, 976 (10th Cir.1995)) (internal citations omitted; emphasis added).

[¶ 77] The situation presented here is, in many aspects, very similar to those reflected in *Simmers* and *Betzle*, relied upon by the majority. In both cases, the defendant was convicted of sexual abuse crimes involving children. In both cases, the defendant confessed to the crimes. On appeal, both defendants relied upon the *corpus delicti* rule [11] and contended that there was no independent corroborating evidence to support the confessions and the convictions. In both cases, this Court rejected the argument.

[¶ 78] In *Simmers*, the defendant was convicted of twelve counts of second-degree sexual assault involving three victims. In determining whether there was sufficient corroborating evidence, this Court did not find it necessary to specifically analyze the evidence for each crime charged. We took a similar approach in *Betzle*. In *Betzle*, the defendant was charged with two counts of sexual assault in the second-degree, two counts of sexual assault in the third degree, and one count of taking immodest, immoral, and indecent liberties with a child. The victim was a disabled, nine-year-old child with the mental ability of a four-year-old.[12] During his interview with the police, the defendant admitted to several specific incidents of improper sexual contact. We found that there was sufficient corroborating evidence:

In this case, the record discloses testimony by the victim's mother that, when the victim returned from Betzle's house, she would come home wearing different clothing, including one of Betzle's shirts on one occasion. Both the victim's mother

10. I question the majority's use of language from the State's brief to imply that the State is conceding that there was no corroborating evidence to support the truth of the confession. Because the issue was not raised, the State never addressed the issue and any statements by the State in its brief are necessarily taken out of context.

11. Again, I would point out that, in this case, Appellant did not raise the *corpus delicti* issue.

12. According to the Court:

The victim in this case is a handicapped child. She suffered from a malignant brain tumor for which she had been subjected to radiation therapy, chemotherapy, and surgery. Although nine years old at the time of the alleged offenses, the victim's mental ability was that of a four-year old or a four-year, eight-month old child. She had been subjected to five surgeries which compounded her slowness, lack of coordination, speech problems, right-sided weakness and impaired long-term memory.

*Betzle*, 847 P.2d at 1013.

and Betzle testified the victim stayed at his house all night on April 14–15, 1990. The father of the victim testified that, around the first of May, the victim complained to him she had soreness in her crotch area. At the same time, the victim's mother noticed a decrease in the victim's appetite, she began to wet her pants and to complain of vaginal pain. The pediatrician who examined the victim testified she observed irritation and redness in the genital area. The counselor of the victim noted that, when she took the victim to their interview room, the victim moved very close to the counselor, took her hand and walked with her without lagging behind which was unusual conduct for the victim. These items of evidence in the record establish sufficiently for purposes of corroboration, the commission of the offense charged, and we hold there was, in this case, sufficient evidence of the *corpus delicti* to justify the introduction into evidence of Betzle's confession.

*Betzle*, 847 P.2d at 1022.

[¶ 79] Using our decisions in *Simmers* and *Betzle* as a guide, and applying our standard of review which requires us to view all evidence in the light most favorable to the State, I would conclude that there is sufficient corroborating evidence to support the truth of the confession and the convictions. The same evidence that supported the conviction on Count One corroborates the fact that Appellant was sexually attracted to the child. He also had opportunity to commit the specific acts alleged in Counts Two through Nine. Appellant is not a stranger to the child. He is his stepfather. He had access to the child. He regularly bathed with the child. There is evidence in the record suggesting that the child had been subjected to improper sexual contact over a period of time. The forensic interviewer expressed concerns over L.W.'s knowledge of sexualized behavior given his young age. Mother had taken L.W. to a doctor with concerns about L.W.'s sexual behavior one week prior to the incident alleged in Count One. During that visit, Mother told the doctor of prior comments that the child had made regarding sexual contact by Appellant in December of the previous year.

[¶ 80] The evidence here is not distinguishable in degree from that presented in *Simmers* and *Betzle*. There was no direct evidence other than the confession of the specific sexual assaults in *Betzle*. Nor was there direct evidence of all of the specific sexual assaults in *Simmers*. Nonetheless, this Court found there was sufficient evidence to corroborate the trustworthiness of the confession. This case is no different. There is sufficient corroborating evidence to allow the jury to infer that the confession is trustworthy and, consequently, there is sufficient evidence to support Appellant's eight convictions for second-degree sexual abuse.

**Competency**

[¶ 81] I disagree with the majority's conclusion that the district court's competency finding was clearly erroneous. A finding is clearly erroneous and should be overturned only if this Court is "left with the definite and firm conviction that a mistake was made." *Lovato v. State*, 2010 WY 38, ¶ 17, 228 P.3d 55, 59 (Wyo.2010). I am not convinced that the district court erred in finding that L.W. was competent.

[¶ 82] From my perspective, the competency decision facing the district court was difficult. The witness was very young and provided testimony that in many respects was troubling. The child, however, also provided testimony that supported the district court's competency determination. The district court did not ignore the problematic testimony and specifically addressed it in its decision. During the competency hearing, the district court also heard testimony from the therapist who had interviewed L.W. shortly after the alleged incident and a clinical psychologist called as a witness by Appellant. The district court referenced the testimony from both of those witnesses in its decision. The district court had the opportunity to observe the child testify during the competency hearing and at trial. Ultimately, the district court concluded that L.W. was competent. It summed up its reasoning in its Decision and Order on Witness Competency:

L.A.W. is currently five years old. He was four-and-a-half when the alleged incident occurred. At the competency hearing, L.A.W. was able to relate that he currently lived in California, and had previously lived in Wyoming. He knew his age, his brother's name, and, when asked to identify his mother, was able to point to the correct person. He appeared to understand every question directed at him, although he occasionally gave an incorrect answer.

L.A.W. correctly identified his teacher, testified that he was in kindergarten, and that he flew on a plane to get to Wyoming. L.A.W. was asked whether he understood the truth versus [an] untruth, and responded affirmatively. When asked whether the statement "We're outside now" is the truth or not the truth, L.A.W. replied "Not the truth." He responded similarly to questions about whether he was in California, and then in Wyoming. L.A.W. seemed confused at some point, however. For instance, when asked how many mother[s] he had, he said, "three." He said he had "four" fathers.

L.A.W. was asked about May 21, 2010, the day Defendant is alleged to have anally raped L.A.W. He testified that he went to the park with his brother and father [Defendant], but that "it was closed." He first testified that they did not drive through the mud, but later said that his mother got [mad] because they drove the car through the mud. L.A.W. then testified that they parked the car, and [he] sat on Defendant's lap in the driver's seat. He honked the horn. L.A.W. testified that while on Defendant's lap in the driver's seat, Defendant removed his pants, and that Defendant was not wearing pants, either.

L.A.W. testified that he does not remember, however, that Defendant raped him. He does not remember telling anyone that the event occurred, or demonstrating with dolls or pictures that the event happened.

Nicole Rosenberger, a therapist at the Children's Advocacy Project, also testified. Ms. Rosenberger is the person who interviewed L.A.W. Ms. Rosenberger testified that L.A.W. appeared to understand truth and untruth. She also testified that she did not observe any mental deficiency in L.A.W.

Dr. McCoy Haddock, a clinical psychologist in California, also testified. L.A.W. is currently a patient of Dr. Haddock. Dr. Haddock testified that L.A.W. has a vivid imagination and that his memory is easily "contaminated."

**Applying the *Woyak* factors, the Court is confident that the first factor is satisfied. L.A.W. is able to understand truth and untruth, and recognize the difference. He appeared [to] the Court to appreciate the need for him to testify truthfully.**

The Court believes the second factor is also satisfied. L.A.W. remembered the day of the incident, and recalled specific events. He was able to speak in detail about flooding inside the park; driving through mud; that his mother was angry with Defendant about driving through the mud; that he honked the horn on the car; and that he sat on Defendant's lap while both of their pants were off. His recollection appeared to be less clear when the questioning turned to whether Defendant raped him or not. He testified that he did not remember telling anyone that Defendant inserted his penis [i]nto his anus. The Court is satisfied that L.A.W.'s memory is sufficient to testify about what happened on [May] 21, 2010. His memory of that day appeared to the Court to be independent and detailed. He appeared to have the capacity to testify whether Defendant raped him or not.

As to the fourth factor, the Court is likewise satisfied that L.A.W.'s vocabulary is sufficiently advanced to express in words his memory of the occurrence.

And finally, L.A.W.'s testimony during the competency hearing clearly shows he clearly has the capacity to understand simple questions about the event.

The Court finds L.A.W. is competent to testify and be cross-examined.

(Emphasis added.)

[¶ 83] The district court also had occasion to address the competency issue after trial

when the issue was raised again by Appellant in his motion for judgment of acquittal. The district court denied the motion. In addressing the competency issue, the district court ruled:

> The first issue is the competency of LAW to testify. This was addressed before trial and LAW was found competent to testify. At the competency hearing LAW did not say that his step-father had raped him, but did say they both had their pants off in the vehicle and that LAW was sitting on the Defendant's lap during their ride around Glenrock on May 21, 2010.

> At trial, however, LAW testified regarding that evening of May 21, 2010:

> "Q. What did Daddy tell you not to tell her? (Mrs. Mersereau)
> A. That he put his wiener in my butthole."

> The Court was convinced, both before and after trial that LAW was competent to testify, that he did so to the best of his ability even though it appeared likely that he was being subjected to some attempted influence by his family.

[¶ 84] In determining that the district court's competency ruling was clearly erroneous, the majority relies upon excerpts from the testimony of L.W. regarding the number of family members and pets he has. The problematic testimony was elicited during the competency hearing in response to questions from defense counsel. At that hearing, defense counsel only asked L.W. a few questions:

Q. L, can I ask you a couple of questions?
A. Yeah.
Q. How many grandmothers do you have?
A. One.
Q. How many sisters do you have?
A. Two.
Q. How many dogs do you have?
A. I don't have dogs.
Q. How many cats do you have?
A. I have only four—wait. Three cats.
Q. How many mothers do you have?
A. Four.
Q. How many fathers do you have?

A. Five.
Q. How many grandfathers do you have?
A. I don't have any.
[Defense Counsel]: I have no further questions.

L.W.'s mother admitted at the competency hearing, and at trial, that she had suggested those questions to defense counsel. At the competency hearing in response to questions from the State, she testified:

Q. Did you tell your husband's attorney what to ask him?
A. No.
Q. You never did?
A. I told him things that L had been telling me. Stories.
Q. Like what?
A. Like having multiple dads. One of his dads is a merman.
Q. So you told [Defense Counsel] some of the things that L told you?
A. Uh-huh.
Q. Why did you tell him?
A. To show that he has imagination, which he does.

She testified similarly at trial during cross-examination by counsel for the State:

Q. Ms. Mersereau, [Defense Counsel] asked if you would do anything. Now those are the words you used, correct?
A. Yes.
Q. Isn't it true—you were here and testified in a previous hearing in this matter, correct?
A. Yes, the pretrial, yes.
Q. Isn't it true that you told [Defense Counsel] questions to ask your son that you knew might confuse him?
A. I do not believe they would confuse him, no.
Q. You gave [Defense Counsel] questions to ask your son, correct?
A. Yes, yes, sir, that I had gotten from my son, you know.
Q. Questions concerning what?
A. How many parents he has. How many grandparents, how many siblings.

Q.  Questions that you knew L got confused with, correct?

A.  He wasn't confused.  He was imagining.

Q.  So you gave [Defense Counsel] questions to ask your son that you knew he imagined?

A.  I did not give him questions.  I told him some of L's stories.

Q.  You told him stories about things that L imagined before we had that hearing with L?

A.  Correct.

Q.  Correct?

A.  Correct.

[¶ 85]  It seems obvious that mother provided the questions to defense counsel in an effort to undermine L.W.'s competency.  It is also obvious that the answers are not correct. The majority apparently concludes that those answers render L.W. incompetent as a matter of law.  The district court took a broader perspective and I am unable to find that the decision reached by the district court is clearly erroneous.  The district court did not ignore those answers.  It considered them, along with all of the evidence presented at the hearing, including its personal observations of L.W., in concluding that L.W. was competent.

[¶ 86]  We have repeatedly recognized that the district court is in a far better position than this Court to make a competency determination.  Our standard of review is appropriately deferential because we are limited to "reading a cold record" while the district court has the advantage of observing the witness during his testimony.  Under the clearly erroneous standard of review, we cannot substitute our judgment for the district court unless we are "firmly convinced" that an error was made.

[¶ 87]  In this case, the district court conducted an appropriate competency hearing, weighed the evidence, applied the five *English* factors, and explained its reasoning. The district court confirmed its competency finding after trial in denying Appellant's motion for judgment of acquittal.  While this is a close case and others may come to a different conclusion, that is not the role we must play in the appellate process.  In this case, we should defer to the district court.  I would affirm the district court's competency determination.

**Admission of Family Photos**

[¶ 88]  I disagree with the majority's conclusion that the district court erred in permitting introduction of nude photos of L.W. and his brother into evidence.  The photos were not included in the appellate record and it is impossible for this Court to conduct an appropriate review of this issue.  Appellant raised this issue on appeal and bears the burden of providing this Court with the necessary record.  *Roeschlein v. State*, 2007 WY 156, ¶ 28, 168 P.3d 468, 476 (Wyo.2007).  This claim of error should be summarily denied.

[¶ 89]  If we were to address the issue on the merits, I would find no abuse of discretion in the district court's evidentiary ruling.

"A trial court's decision on the admissibility of evidence is entitled to considerable deference, and will not be reversed on appeal unless the appellant demonstrates a clear abuse of discretion." *Leyva v. State*, 2007 WY 136, ¶ 17, 165 P.3d 446, 452 (Wyo. 2007).  "[A]s long as there exists a legitimate basis for the trial court's ruling, that ruling will not be disturbed on appeal." *Id.*, quoting *Sanchez v. State*, 2006 WY 116, ¶ 20, 142 P.3d 1134, 1140 (Wyo.2006).

*Vigil v. State*, 2010 WY 15, ¶ 11, 224 P.3d 31, 36 (Wyo.2010).

[¶ 90]  The photos were offered by the State to establish motive.  The motive in this case was Appellant's sexual attraction to young children, and L.W. in particular.  This is a proper purpose under W.R.E. 404(b). The district court reviewed the photos, heard argument from counsel, and, after conducting the appropriate analysis, determined that the photos were admissible.  In its Decision and Order on Witness Competency, the district court applied the *Gleason* factors and explained:

These images show the children taking baths or potty training.  Other images, however, are more disturbing.  Many of the offered images show E.A.M. and L.A.W. playing outdoors in the mud while

nude, with mud smeared on the children's body and genitalia. Others show [the appellant] sitting in the bathtub with L.A.W. on his lap. At least three of the images focus on the children's genitals or buttocks. One picture shows a young child face down on a bed with his buttocks and hips extended up into the air.

. . .

### a. Proper Purpose

The State offers this evidence for motive, and that is indeed a proper purpose.

### b. Relevance

The Court finds this evidence is relevant. The fact that Defendant possessed, and apparently took, a number of nude photographs of L.A.W. and E.A.M. is highly relevant, considering the charges in this case.

### c. Probative Value vs. Danger of Unfair Prejudice

. . .

Defendant does dispute the issue on which this evidence is offered, *i.e.* he contends that these pictures are innocent and the type normally taken by parents. The Court disagrees. The Court is of the opinion that these images are not simply pictures that parents typically take of their children. Some of the pictures clearly focus on and emphasize the children's nudity. At the very least, the jury should be permitted to determine whether these images are in fact the type typically taken by parents, or something more sinister. Defendant will, of course, be free to argue to the jury that the images in fact are innocent, and simply the type of pictures parents normally take of their young children.

. . .

Regarding the prejudicial factors, the nude pictures of L.A.W. and E.A.M. are not reprehensible if Defendant is correct, and they are simply innocent pictures. The pictures are prejudicial if the jury sees in them something other than the innocence attached by Defendant. The children in the picture[s] are certainly sympathetic.

[¶ 91] Without viewing the photos, it is impossible to disagree with the district court's ruling. Appellant contends the photos are innocent. The State contends otherwise. If the photos are "innocent," it is difficult to understand how Appellant is prejudiced by admission of the photos. If the photos are probative of motive, the State should be allowed to introduce the photos. In any event, the evidentiary significance of the photos is properly a question to be resolved by the jury.

**Comment upon the Weight of the Evidence**

[¶ 92] The instruction at issue was a limiting instruction requested by Appellant. The instruction was read to the jury prior to the beginning of the testimony of Agent Timmons. Because the instruction was requested by Appellant, we must apply the invited error doctrine. "As applied to jury instructions, the invited error doctrine provides that use of an instruction proposed by the appellant may not be grounds for reversal unless such was 'necessarily prejudicial.'" *Butcher v. State,* 2005 WY 146, ¶ 29, 123 P.3d 543, 552 (Wyo.2005), quoting *Vanvorst v. State,* 1 P.3d 1223, 1230 (Wyo.2000). *See also Bromley v. State,* 2007 WY 20, 35, 150 P.3d 1202, 1213 (Wyo.2007); *Rawle v. State,* 2007 WY 59, ¶ 20, 155 P.3d 1024, 1030 (Wyo.2007); *Snow v. State,* 2009 WY 117, ¶ 26, 216 P.3d 505, 513 (Wyo.2009). I would find that Appellant has failed to satisfy that burden.

[¶ 93] The majority did not apply the invited error standard of review. In applying a basic plain error analysis, the majority finds prejudice because "the district court informed the jury that the websites did contain child pornography." The oral limiting instruction, however, was not the only jury instruction dealing with this issue.

[¶ 94] The jury was provided with Instruction No. 18 prior to deliberations. That instruction states, in pertinent part:

> Also, you heard evidence that there were **suspected** child pornography websites on the Defendant's computer. This evidence was admitted for a limited purpose. . . . However, before you consider evidence of the photographs or the websites, **it must be proven to you by a preponderance of**

the evidence that the Defendant viewed the photographs and/or websites.[13]

(Emphasis added.) Appellant did not object to that instruction. Jury instructions are to be viewed in their entirety and considered as a whole. *Burnett v. State*, 2011 WY 169, ¶ 14, 267 P.3d 1083, 1087 (Wyo.2011). In light of the heightened burden facing Appellant under the invited error doctrine and the district court's Instruction No. 18, I would conclude that Appellant has failed to establish that the challenged instruction was "necessarily prejudicial."

## Improper Opinion Evidence

[¶ 95]  In his fifth issue, Appellant contends that plain error occurred during trial when the prosecutor improperly commented upon the credibility of Appellant in his opening statement and closing argument. The majority rejected that argument finding that the prosecutor was not expressing his opinion on Appellant's credibility, but rather, was merely commenting upon evidence that would be, or was, produced at trial. I agree with the majority's resolution of that issue.

[¶ 96]  The primary focus of Appellant's fifth issue, however, involved the testimony of Officer Peech and a recording, played for the jury, of significant aspects of Appellant's interview with law enforcement. The majority concludes that plain error occurred because Officer Peech provided "impermissible opinion evidence regarding the appellant's credibility." The majority concludes that the prejudice prong of the test for plain error was satisfied because defense counsel was forced to play otherwise objectionable portions of the interview for the jury in order to respond to the improper opinion testimony. I disagree with this result for several reasons.

[¶ 97]  First, Officer Peech was testifying as to facts. He was not providing opinion testimony regarding the veracity of Appellant's statements. Second, even if the testimony could be construed as improper opinion testimony, the district court responded to the objection by immediately providing the jury a cautionary instruction. There was no prejudice to Appellant at that point. Third, it

was Appellant who introduced the objectionable excerpts from the confession, not the State. Fourth, the majority's assertion that Appellant's decision to introduce the interview evidence was forced by the brief comment of Officer Peech is not supported by the record.

[¶ 98]  In order to prevail on his claim of plain error, Appellant must establish that a clear and unequivocal rule of law was violated. Appellant asserts, and the majority agrees, that the challenged testimony from Officer Peech was improper opinion testimony regarding the truthfulness of Appellant. The State disagrees and contends that Officer Peech was referencing specific admissions of lying made by Appellant during the interview. I am inclined to agree with the State.

[¶ 99]  In order to evaluate Officer Peech's testimony, it is essential to place it in context. Officer Peech was called as a witness by the State. He provided background information regarding his law enforcement training and explained that he had become involved in the case at the request of the Department of Family Services. He testified that he contacted Appellant at his house and Appellant agreed to meet with him at the sheriff's office. Appellant arrived at the office a short time later and the interview commenced. He advised Appellant that his stepson had made an allegation of sexual abuse against him. He testified that Appellant did not appear to be intoxicated or under the influence of drugs during any part of the interview.

[¶ 100]  He then testified:

Q:  Now, during the course of that interview, say within the first hour or so, did Mr. Mersereau ever indicate whether he was telling the truth about what you were talking about?

A:  He indicated that he was lying—

[DEFENSE COUNSEL]:  Objection, speculative—pardon me, go ahead.

THE WITNESS:  He told me several times throughout the interview he was lying.

13.  The word "suspected" was handwritten on the typed jury instruction.

Q: How would he tell you that?

A: I confronted him a couple of times on some stuff that he lied about, and he admitted it was a lie and told me the truth.

A couple of times I—I put an imaginative scale on the table of 0 to a hundred or 0 to 10 and asked him where he was on that, and once he told me he was 30, and once he told me, I think, three.

Q: What were the scales, one being a lie and ten being the truth?

A: It was 0 being a lie and ten or a hundred being the truth.

[¶ 101] Officer Peech then related the admissions by Appellant regarding sexual contact that formed the basis of the charges alleged in Counts Two through Nine. He testified that Appellant made the same admissions during the interview on the second day when Investigator Koss was present. He testified about Appellant's responses to questions regarding the incident on May 21 (Count One). He testified about Appellant's responses to his questions regarding anal sex and that questioning led to this exchange:

Q: When you say tried, had he had anal sex with her; did he tell you?

A: In the first interview initially we were talking about what Danielle told us that he tried to have anal sex with her and she was asleep. She felt like she needed to defecate, and she confronted him about that, and he denied it, and later he admitted.

Q: First he denied it, but later said that he had?

A: Yes, sir.

Q: When did he admit that he had done it later?

A: Later in the interview. Probably an hour and a half. I don't know.

Q: Mr. Peech, you say that total first day was roughly 4, 4 and a half hours?

A: Yes, sir.

Q: Can you tell us why you went that long?

A: He was not telling us the truth. We would get a little truth—he would deny stuff—

[DEFENSE COUNSEL]: Objection. This answer is speculative and is a guess.

[PROSECUTION]: I'm asking why he conducted the interview so long. He can refrain from saying whether it was the truth or not.

THE COURT: **Well, insofar as the defendant admitted that he wasn't telling the truth, you can answer that—you can talk about that.**

**In terms of your general opinion, the jury will disregard any general opinions, because the jury is the sole judge of the credibility of the witnesses.**

**With that ruling, go ahead.**

Q: My question, Mr. Peech, is why did you interview him for that long?

A: **Because he admitted several times that he lied to us about facts that we were talking about.** And he admitted that he was lying on a scale, and that it just kept on taking us a little bit more time to get another truthful fact out of him and another truthful fact out of him.

Q: What he described?

A: To another truthful fact of what he described.

(Emphasis added.) In context, it is apparent that Officer Peech was referring to the admissions Appellant had made regarding his lack of truthfulness. Because Officer Peech was referring to admissions of Appellant, there was no transgression of a clear and unequivocal rule of law.

[¶ 102] More significantly, even if the comment of Officer Peech is viewed as improper opinion testimony concerning Appellant's truthfulness, I am unable to find any prejudice caused by the brief exchange. The district court apparently recognized that the comment could be viewed either as a statement referring to the prior admissions of untruthfulness by Appellant, or improper opinion testimony concerning Appellant's untruthfulness. In response, the district court gave an appropriate cautionary instruction. The majority concedes that "under most circumstances this error might be considered harmless."

[¶ 103] The majority finds prejudice, however, by concluding that this brief exchange forced Appellant to introduce the objectionable portions of the interrogation into

evidence. It is difficult to understand how the majority reaches that conclusion, and I find no support for it in the record. Perhaps most troubling is the majority's reference to the denial of the motion to suppress. According to the majority, "defense counsel was left with little choice but to attempt to exploit the interview after the district court denied the motion to suppress." I agree with that statement, but the dismissal of a motion to suppress a confession should not result in a finding of plain error when the defense opts to introduce portions of the confession into evidence. Here, the majority correctly found no error in the district court's denial of the motion to suppress. In that confession, Appellant specifically admitted to the conduct that resulted in the charges described in Counts Two through Nine. Although he denied the specific sexual act alleged in Count One, he also admitted to relevant facts concerning that alleged incident.

[¶ 104] The State could properly introduce these admissions into evidence. Appellant knew from the outset that he would have to confront that evidence at trial. As a tactical decision, he opted to contest the voluntariness of the confession and the admissions at trial. Counsel for Appellant indicated in opening statement that they would challenge the confession: "We are going to look at a confession, and we are going to look at how the police may have beat the defendant like a rented mule to elicit this so-called confession."

[¶ 105] In his pretrial memorandum, Appellant identified a forensic psychologist as a potential defense witness. During trial, the psychologist testified for the defense. His testimony encompassed the interrogation methods and the psychology of an accused in an interrogation setting. He testified specifically as to Officer Peech's interrogation techniques and the impact it may have had on Appellant. In response to questioning from defense counsel, he testified that he did not hear Appellant admit to lying in the interview. He opined that Appellant's statements regarding the improper touching (Counts

Two through Nine) were not admissions but merely speculation from Appellant as to how or why L.W. would have come up with the story of anal assault if it had not actually occurred.

[¶ 106] During the State's examination of Officer Peech, and prior to the exchange challenged by Appellant, the State attempted to introduce a transcript of a portion of the interview into evidence. Defense counsel objected:

> [DEFENSE COUNSEL]: Your Honor, this is just a piece of eight hours of interviews. I would object.
>
> If we are going to have the interview, we ought to put the whole interview in. This is just one piece out of eight hours. It doesn't tell everything that happened.
>
> And I have notes on this section. I think there is an inaccuracy in here, and I would like to double-check that.
>
> THE COURT: Well, 7—in the absence of a stipulation, 7 is hearsay.

Thereafter, the State did not attempt to introduce any written or recorded portion of the interview into evidence during its direct examination of Officer Peech. The recorded interview was introduced by Appellant during cross-examination of Officer Peech.[14]

[¶ 107] This case is vastly different than *Sweet*, relied upon by the majority. In *Sweet*, the investigating officer provided improper opinion testimony concerning the veracity of a witness and the untruthfulness of the defendant. Some of the objectionable opinion testimony occurred during the interrogation by police and some was introduced by direct testimony of the officer at trial. Significantly, all of it was introduced by the State. *Id.*, ¶¶ 11–20, 234 P.3d at 1198–1201.

[¶ 108] In *Pendleton*, the objectionable opinion comments were made during the interrogation. The State sought to introduce the evidence. Defense counsel voiced no objection and urged introduction of the interview. We rejected the defendant's plain error contention, in part, because the defen-

---

**14.** On redirect, the State introduced a brief portion of the interview into evidence without objection. That portion of the interview is not challenged by Appellant, or relied upon by the majority in reaching its determination. *See* majority opinion paragraph 54.

dant had advocated for the introduction of the evidence. *Id.*, ¶ 16, 180 P.3d at 217–18.

[¶ 109] Here, the State did not introduce any of the objectionable portions of the interview. Appellant did not merely advocate for introduction of evidence. In this case, Appellant introduced all of the objectionable portions of the interview in an effort to discredit the voluntariness of the confession. It was a legitimate trial tactic and dovetailed with specific jury instructions consistent with the defense theory of the case. Instructions 17 and 19 advised the jury:

### Instruction No. 17

Statements made by the Defendant to law enforcement officers shall be considered by you only if you first determine that such statements were made voluntarily, in whole or in part. Statements are made voluntarily if they are the product of a free and deliberate choice rather than by intimidation [or] coercion, or in reliance upon an express promise of special favor, leniency or benefit. The fact the Defendant was advised of his constitutional rights, the conduct of the officers during the interview, the apparent intelligence of the Defendant, his age and his experience with law enforcement are but a few of the factors you are to consider as part of the totality of the circumstances under which the statement was elicited. In making this determination, you are to view those factors as a reasonable person would view them and not as the Defendant may claim to have perceived them.

I[f] you find the statement is not voluntary, you must not consider it as evidence against the Defendant. If you find it is voluntary, in whole or in part, you must consider only that [part] of the statement which you find to have been voluntary.

### Instruction No. 19

Evidence has been admitted that the Defendant made statements regarding the crimes charged. The Defendant contends that the statements were not truthful.

Whether the Defendant's statements, or any part thereof, were truthful is a question for the jury.

Although the majority finds plain error in the receipt of the evidence, there was simply no basis for the district court to prevent introduction of the evidence when it was sought by Appellant. It was sound defense strategy. It was not error to allow Appellant to pursue that line of defense.

[¶ 110] I am also concerned about the impact of this decision on future cases. Every defendant convicted of a crime based, in part, on evidence obtained during interrogation by law enforcement, can enhance his chances for a reversal on appeal merely by introducing at trial objectionable statements made during the interrogation. While that may not be the result intended by the majority, application of this precedent will inexorably lead to that result.

[¶ 111] In sum, I would find that Appellant has failed to establish plain error. Appellant introduced the objectionable portion of the interview into evidence. He was not forced to introduce that evidence because of the brief comment by Officer Peech. That comment could reasonably be viewed as a reference to specific admissions made by Appellant during the interview. Even if it could be viewed as improper opinion testimony, the district court minimized any prejudice by immediately issuing a cautionary instruction. Admission of the interview evidence was consistent with the defense theory of the case employed from opening statement through closing argument. We should reject Appellant's claim of plain error for the same reasons we expressed in *Pendleton:*

As can be seen, the appellant relied heavily on the recorded interview, and this evidence was an important, if not vital, part of the appellant's defense strategy. She cannot have it both ways, and now claim that she was prejudiced by the inclusion of this evidence.

*Id.*, ¶ 16, 180 P.3d at 217–18.